AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
5/16/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eva _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
05/16/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KH _____ DEPUTY

United States of America

v.

Todd Ament,

Defendant(s)

Case No.   8:22-mj-00357-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 4, 2020, in Orange County in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1014 | False Statements to a Financial Institution |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

BRIAN ADKINS, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____ May 16, 2022 _____          _____ /s/ Autumn D. Spaeth _____
                                                                    *Judge's signature*

City and state:  _____ Orange County, California _____     Hon. Autumn D. Spaeth, U.S. Magistrate Judge
                                                                              *Printed name and title*

AUSA: Daniel Ahn (x3539), Daniel Lim (x3538), Melissa Rabbani (x3499)

## Table of Contents

I.   Introduction ...................................................................................1

II.  Purpose of Affidavit ...................................................................1

III. Basis of Information ...................................................................2

IV.  Summary of Probable Cause ....................................................5

V.   Statement of Probable Cause ...................................................8

    A.  Introduction to AMENT's and Political Consultant
       1's Influence Over the City of Anaheim, and the
       Use of Their Respective Entities (Firm A and the
       Chamber) to Facilitate Their Personal Strategic
       and Financial Goals ...................................................................8

        1.  AMENT and Political Consultant 1 Were Ring
           Leaders of a Covert Group that Appeared to
           Exert Significant Influence Over the City of
           Anaheim ...................................................................8

        2.  Political Consultant 1 and AMENT's Use of Firm
           A and the Chamber, Respectively, to Conduct
           Suspicious Financial Transactions as a Means
           to Achieve Certain Goals, Including
           Concealment ...................................................................20

        3.  AMENT, Political Consultant 1, and Company A
           Employee Used Their Influence to Script
           Statements Made by Elected Official 1 at an
           Anaheim City Council Meeting ...................................29

    B.  The Fraudulent Cannabis Scheme and the Defrauding
       of the Cannabis Client by AMENT and Political
       Consultant 1 ...................................................................31

        1.  Background on the Chamber's Involvement in
           Crafting a Cannabis Ordinance for Anaheim
           and CW1's Cooperation with the FBI ...................31

        2.  The Cannabis Client Made Three Separate
           Payments to the Chamber, Portions of Which
           Were Then Sent to Firm A, and Then
           Immediately Back to AMENT ...........................................43

        3.  AMENT and Political Consultant 1 Provided a
           False and Misleading Breakdown of
           Expenditures Related to the Cannabis
           Client's Funds to CW1 ...................................................46

        4.  AMENT and Political Consultant 1 Advocated
           Against the Interests of the Cannabis Client

and CW1's Associate's Client Despite
Payments from Them to Advocate on Their
Behalf ................................................................65

5.  Political Consultant 1 Was Directly Asked by
CW1 About Payments Made to AMENT from the
Cannabis Client's Funds ...............................72

C.  Political Consultant 1 and AMENT Initiated a Scheme
to Purchase a Second Home for AMENT Through the
Commission of the Target Offense........................82

1.  Political Consultant 1 Induced His Employee to
Transfer $205,000 to AMENT Under False
and/or Fraudulent Pretenses........................82

2.  Material Misrepresentations, Falsehoods, and
Omissions Contained in AMENT's Loan Package
to Chase ......................................................90

3.  A Summary Timeline of AMENT's Purchase of the
Big Bear House ...........................................96

VI.  Conclusion ...............................................................99

## <u>AFFIDAVIT</u>

I, Brian C. Adkins, being duly sworn, declare and state as follows:

### I.  <u>Introduction</u>

1.   I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2010.  I am currently assigned to a public corruption squad. During my employment with the FBI, I have participated in multiple investigations of public officials, including those involving bribery, extortion, mail and wire fraud, fraud related to financial institutions, and obstruction of justice.  Many of these investigations have involved the use of informants and cooperating witnesses, and have required financial analysis.  My duties have included conducting covert investigations of public officials.  I have also conducted physical surveillance and have monitored electronic surveillance.  In addition, I have been trained on the investigation of public corruption and other white collar crimes and have been the affiant on multiple Title III wiretap affidavits, both in the Northern District of Illinois and the Central District of California.

### II. <u>Purpose of Affidavit</u>

3.   This affidavit is made in support of an application for an arrest warrant for Todd AMENT ("AMENT").  As will be

1

described in further detail below, I believe AMENT has engaged in criminal offenses involving one or more violations of 18 U.S.C. § 1014 (False Statements to a Financial Institution) (the "Target Offense").

4.    As a result of my personal participation in this investigation, my review of authorized intercepted communications over multiple Target Phones, reports made to me by other FBI employees, including FBI Special Agents ("SA") Joseph Nieblas and Eric Bomgren, and FBI Forensic Accountants ("FoA") Katherine Ramirez and Carlene Kikugawa, and information obtained from cooperating witnesses, I am familiar with all aspects of this investigation.  On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this affidavit show that there is probable cause to believe that AMENT has committed one or more violations of the Target Offense.

### III. **Basis of Information**

5.    I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a.    the content of communications intercepted over the cellular telephone of a political consultant ("Political

Consultant 1")[1] ("Target Phone 1")[2], from November 10, 2020
through December 9, 2020;

      b.   the content of communications intercepted over
Target Phone 1 and AMENT's cellular telephone ("Target Phone
2")[3], from March 15, 2021 to April 13, 2021;

      c.   an FBI Confidential Witness ("CW1")[4];

---

[1] Political Consultant 1 is a principal partner of a
nationally known political and public affairs company.

[2] At all times relevant herein, Target Phone 1 was
subscribed to by Political Consultant 1 at an address associated
with Political Consultant 1.

[3] At all times relevant herein, Target Phone 2 was
subscribed to by AMENT's former employer, the Anaheim Chamber of
Commerce, 2099 S. State College Blvd, Ste 650, Anaheim, CA
92816, and used by AMENT.

[4] The FBI has been investigating CW1 since approximately
2018 for violations of federal criminal law to include 18 U.S.C.
§ 666 (theft or bribery concerning programs receiving federal
funds), among others.  In July 2019, I sought court
authorization to intercept electronic and wire communications
over CW1's phone.  I was granted Title III authorization from
the court and intercepted electronic and wire communications
over CW1's phone from approximately June 24, 2019 through July
23, 2019.  On October 28, 2019, CW1 was arrested, pursuant to a
complaint, for violating 18 U.S.C. § 666.  CW1 was interviewed
on the same day as CW1's arrest, and CW1 subsequently agreed to
cooperate with the FBI in this investigation.  The complaint was
dismissed without prejudice at the request of the government.
Based on my interactions with CW1, and the interactions of other
agents with CW1, particularly FBI SA Joseph Nieblas, I believe
that CW1 has lacked candor at times during CW1's assistance in
this investigation.  For example, I believe CW1 lied to FBI SAs
during CW1's interview on October 28, 2019.  I also believe CW1
has omitted material facts to investigators throughout CW1's
cooperation with the FBI, including additional instances where
CW1 has offered to pay bribes to elected public officials.
However, the FBI has relied on information provided by CW1 in
instances where such information has been deemed credible by way
of corroboration.  CW1 and the government have not been able to
reach an agreement on a pre-indictment resolution, and at this
time, there is no further cooperation expected.  Based on the
government's interaction with CW1 and CW1's counsel, I believe
CW1's motive for cooperating in this investigation was to
receive leniency for the federal criminal violation CW1 was

*(footnote cont'd on next page)*

      d.    two FBI Confidential Human Sources ("CHS1"[5] and "CHS2"[6])[7];

      e.    other recorded communications as described below;

      f.    a pen register and trap and trace device on Target Phone 1 and Target Phone 2;

      g.    my experience investigating the Target Offense;

---

originally arrested for, as well as other possible criminal conduct.  The government has not made any promises of leniency to CW1 or CW1's counsel.  As of April 11, 2022, CW1 has no known criminal history.

[5] CHS1 was arrested on or about March 5, 2012 for fugitive from justice, in violation of California Penal Code § 1551.1. FBI SA Joseph Nieblas questioned CHS1 about the charge and CHS1 stated that s/he had been previously arrested for writing a check without having funds to back its stated value.  CHS1's criminal history was last checked on May 19, 2020 by CHS1's handling agent, which did not indicate any additional arrests since the March 5, 2012 arrest previously identified.  CHS1 does not have any known criminal convictions.

[6] CHS2's criminal history was last checked on January 31, 2020 by CHS2's handling agent, which indicated that CHS2 had no criminal history.  CHS2 was recently recognized by the Director of the FBI for assistance CHS2 has provided to the FBI in unrelated investigations.

[7] CHS1 and CHS2 agreed to assist the FBI because they were motivated by patriotism and wish to minimize corrupt public officials in the United States.  CHS1 and CHS2 were documented as CHSs by another FBI Field Office prior to their assistance with FBI Los Angeles.  CHS1 and CHS2 have received free meals during debriefings and have been reimbursed for personal expenses incurred at the direction of the FBI.  As of October 13, 2020, CHS1 has received $51.28 in reimbursements while CHS2 has received $242.87 in reimbursements.  The FBI was aware that CHS1 and CHS2 were operating a cannabis business that was in violation of federal law, however both CHS1 and CHS2 no longer operate a cannabis business.  While the FBI deems this activity unauthorized illegal activity, to my knowledge, CHS1 and CHS2 were operating their cannabis business in accordance with California state and local laws.  The FBI was aware of CHS1 and CHS2's cannabis business before they became CHSs.  Based on my training and experience, I have found CHS1 and CHS2 to be credible and reliable as their information has been corroborated by other evidence obtained, including recorded meetings and calls.

h.    oral and written reports and documents about this investigation that I have received from members of the FBI;

i.    discussions I have had personally concerning this investigation with experienced white collar investigators;

j.    public records;

k.    telephone toll records, pen register and trap and trace information, and telephone subscriber information;

l.    statements of witnesses; and

m.    bank and other financial records to include records received from escrow and mortgage companies.

6.    Since the affidavit is being submitted for the purpose of securing an arrest warrant for AMENT, I have not included each and every fact known to me concerning this investigation.

## IV. Summary of Probable Cause

7.    The investigation to date has developed probable cause to believe the following: (1) AMENT and Political Consultant 1 have engaged in a scheme to defraud CW1 and CW1's client ("the Cannabis Client"), as well as to embezzle from the Anaheim Chamber of Commerce ("the Chamber"), by soliciting funds from the Cannabis Client based on false representations and diverting those same funds from the Chamber to AMENT's personal bank account; and (2) AMENT and Political Consultant 1 have engaged in a scheme to commit mortgage fraud related to the purchase of a second home for AMENT in Big Bear, CA.

8.    The investigation has revealed that in 2019 and 2020, AMENT and Political Consultant 1 solicited funds from the

Cannabis Client and CW1's associate's[8] client in exchange for influence over a proposed cannabis ordinance in the City of Anaheim.  However, they were not given influence over drafting a proposed cannabis ordinance as promised, AMENT and Political Consultant 1 misrepresented where and how they spent the funds, and AMENT and Political Consultant 1 concealed the fact that a substantial amount appeared to be embezzled out of the Chamber and into an entity controlled by AMENT personally.  Furthermore, the investigation has revealed that AMENT and Political Consultant 1 appeared to have advocated against the interests of CW1, the Cannabis Client, and CW1's associate's client, despite having solicited, and collected, a significant amount of money from them.

9.    The investigation has also revealed that AMENT, with the assistance of Political Consultant 1, has engaged in a scheme to commit mortgage fraud for the purpose of securing financing in order for AMENT to purchase a second home in Big Bear, CA.  Specifically, and as will be described in further detail below, Political Consultant 1 and AMENT devised a scheme to launder proceeds intended for the Chamber, through Firm A, and into accounts controlled by AMENT, giving AMENT the ability to show more cash-on-hand than he actually had, thereby allowing AMENT to fraudulently secure financing for the home purchase. Additionally, AMENT entered into an out-of-escrow transaction

---

[8] CW1's associate represented another cannabis client in a similar fashion to CW1's representation of the Cannabis Client throughout the scheme described herein.

with the seller of the Big Bear home, deceiving the financial
institution funding the home loan in the process.

10.  I believe AMENT and Political Consultant 1 have been
successful in completing the aforementioned schemes, and
possibly others, because, at the time, they both occupied
positions of influence within the City of Anaheim ("Anaheim") --
AMENT was the President and Chief Executive Officer ("CEO") of
the Chamber[9], while Political Consultant 1 was a Senior Partner
of a national political consulting firm ("Firm A") whose clients
include an influential company located in Anaheim ("Company A").

11.  The majority of the evidence presented in this
affidavit was collected from approximately 2018 until on or
about September 14, 2021.  On that date, AMENT began to
cooperate with the FBI in this investigation.  Subsequent to
AMENT's cooperation, he has been interviewed on multiple
occasions regarding a variety of topics, including the schemes
presented herein.  At various times throughout AMENT's
cooperation, he has claimed to not recall certain facts and
events, to include potential additional criminal conduct.  I do
not know if his lack of recall is genuine or feigned, however, I
believe the schemes alleged herein are supported by both AMENT's
recollection and independent corroborating facts to support the
charges for one or more violations of the Target Offense.

---

[9] AMENT is no longer employed by the Chamber.

## V.  <u>Statement of Probable Cause</u>

A.    **Introduction to AMENT's and Political Consultant 1's Influence Over the City of Anaheim, and the Use of Their Respective Entities (Firm A and the Chamber) to Facilitate Their Personal Strategic and Financial Goals**

1.    <u>AMENT and Political Consultant 1 Were Ring Leaders of a Covert Group that Appeared to Exert Significant Influence Over the City of Anaheim</u>

12.  The investigation has revealed that AMENT and Political Consultant 1 were the ring leaders of a small group of individuals who met in person to discuss strategy surrounding several matters within Anaheim -- matters that were often pending, or soon to be pending, before the Anaheim City Council. The meetings that Political Consultant 1 and AMENT orchestrated were referred to as retreats, and as described below, attendees to the retreats, one of which was believed to have taken place within a suite at a hotel near the Anaheim Resort,[10] were carefully selected by Political Consultant 1 and AMENT, with input from Company A Employee.

13.  Monitoring agents began intercepting communications over Target Phone 1 discussing the existence and planning of an upcoming retreat.  On November 23, 2020, at approximately 1:41 p.m., monitoring agents intercepted an outgoing call from Target Phone 1 to AMENT, using Target Phone 2.  In footnotes throughout this affidavit, I have identified the titles of the Anaheim council members, Anaheim city employees, and Firm A's employees

---

[10] According to www.anaheim.net, last visited on May 13, 2022, "[t]he Anaheim Resort is a 1,100 acre portion of the City of Anaheim…[that] is home to the Disneyland Resort, the Anaheim Convention Center, Anaheim GardenWalk and numerous hotels and restaurants."

based on my review of public records at the time of, and subsequent to, the intercepted calls.  During the phone call, the following conversation occurred between Political Consultant 1 ("PC1") and AMENT:[11]

> AMENT:     And then we gotta decide are we bring in the
>            other two council members.
>
> PC1:       Yes, uh.
>
> AMENT:     So, [Elected Official 2][12] and [Elected Official
>            3][13][14].
>
> PC1:       Well, so you know, I was a little bit rethinking
>            that now, I agree with the premise that we need
>            to keep [Elected Official 2] close, but does that
>            mean that we include him in the second retreat
>            but not the first retreat, because the first

---

[11] Descriptions of recorded conversations are summaries based on my and/or other FBI employees' review of the recordings, understanding of the context of the recorded conversations, knowledge of this case, and my training and experience.  These descriptions are not based on a final, verbatim transcript.  At times, I have placed my understanding of what is being said in brackets within the quotes.  Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in a recorded conversation.

[12] Council Member - City of Anaheim.

[13] Council Member - City of Anaheim.

[14] Throughout this affidavit I have attempted to provide anonymity to several individuals by replacing their actual names with various monikers (e.g., Elected Official 1, Anaheim Employee 1, Company A Employee, and so on).  Their monikers accurately reflect their true occupations and/or positions at the times reflected, which I have learned and believe to be accurate based on my knowledge of this investigation, open source internet searches, FBI databases, and information provided by witnesses.

retreat needs to be, you know, family members
only?

14.  Based on my training and experience, including my
knowledge of this investigation to date, I believe that
Political Consultant 1 and AMENT were discussing whom to include
in this planned "retreat."  Furthermore, based on Political
Consultant 1's statement that the retreat needs to be "family
members only," I believe that the metric used for deciding whom
to invite to the retreat was, first and foremost, based on
trust.  Just prior to this exchange, during the same monitored
phone call (as well as in subsequent calls), I believe that
AMENT confirmed that, in addition to himself, the following
individuals would attend the retreat: Elected Official 1[15],
Anaheim Employee 1[16], Chamber Employee 1, Company A Employee[17],
Consultant 2,[18] and Political Consultant 1.

15.  A short time later during the same monitored phone
call, as Political Consultant 1 and AMENT were discussing
whether they felt they could trust Elected Official 2, they had
the following exchange:

AMENT:     For me, we know [Elected Official 2] this much
           right, so if we go take him into the cabal and
           he's playing double agent, then we are all
           screwed.

---

[15] Council Member - City of Anaheim.
[16] An employee with the City of Anaheim.
[17] An employee with Company A.
[18] Former Council Member - City of Anaheim.

10

PC1:        Right, that's my point, I think, like for
            example, at the retreat, I want to have a topic
            being, how much do we trust [Elected Official 5]?
            How much do we trust [Elected Official 2]?  I
            don't have any doubt about [Elected Official 7][19].
            I'm not advocating that we invite him, I'm just
            saying I don't think we need to worry about him.
            I think ideologically he is a true believer.

16.  Based on my training and experience, including my
knowledge of this investigation to date, I believe that
Political Consultant 1 and AMENT continued their discussion
about which Anaheim City Council Members they could trust to
bring into their group, this time using the term "cabal" to
identify their group.  Based on their use of the terms "family
members" and "cabal" coupled with their primary metric of trust
to determine which individuals they felt comfortable inviting
into the group, I believe that Political Consultant 1 and AMENT
had defined a specific, covert group of individuals that wielded
significant influence over the inner workings of Anaheim's
government.  Furthermore, I believe that the intent of this
group, at least in part, was to conceal their actions, as AMENT
was worried about Elected Official 2 being a potential "double
agent," whose presence in the "cabal" could result in everyone
being "screwed."  I also believe that Political Consultant 1's
statement about not needing "to worry about [Elected Official
7]," but nonetheless not advocating for inviting Elected

---

[19] Council Member - City of Anaheim.

Official 7, simply meant that, while he trusted Elected Official 7 in some respects, he did not trust Elected Official 7 enough to invite him into the "family" or "cabal."  A short time later, during the same monitored phone call, the issue of trust and whom to invite to the retreat continued between Political Consultant 1 and AMENT:

| | |
|---|---|
| AMENT: | [Elected Official 2] has a very easy, bright future playing to the team, right? |
| PC1: | Right. |
| AMENT: | He is smart enough to know how to take hall passes where he needs them, but not screw with your team. So I think having that relationship is key, but we don't have any reason to distrust him, but we don't have a good enough reason to go have the family meeting with him.  I agree with that. |
| PC1: | Right. |
| AMENT: | Cause I was either gonna be zero [City Council Members at the retreat] beyond [Elected Official 1], there was even a part of me that said let's leave [Elected Official 1] out of this, candidly, and say let's build the plan on what needs to be the ship cause [Elected Official 1's] very good at participating in a meeting, but he knows if we need to cover topics, you know 90% of time he lets us go, without saying nope this is how it's gonna be, and I think today was a perfect |

example, the more people in the room that gets a
little more awkward.

PC1:        Do we include any other council members?  If we
do, I'm kind of defaulting to back to [Elected
Official 3] and [Elected Official 4] at this
first one.  [Elected Official 3] may do a little
bit of self promoting, but at the end of the day,
he's going to be loyal to the team, [Elected
Official 4] the same.  Almost to the point,
[Elected Official 4], we tell [Elected Official
4], we got you reelected, we expect you to be a
loyal member of the team, you know for purposes,
we're going to do a little bit more with [Elected
Official 2] to keep him close, and that means
there's a couple you get excluded from, and it's
not because we don't love you anymore, it's
because strategically that's what we need to do
for the next two years.  You'll always have your
voice, plus you -- give him the Mayor Pro Tem and
tell him he's always gonna be our number one guy,
but we're gonna keep [Elected Official 2] close.
[Elected Official 3] up for reelection so he's
gotta be at more of the meetings, but hopefully
[Elected Official 4] won't whine about that, but
it would be do we invite [Elected Official 4] and
tell him that at the retreat, I was thinking
about that.

17.   Based on my training and experience, including my
knowledge of this investigation to date, I believe that
Political Consultant 1 and AMENT continued to discuss whom they
wanted to invite to their covert group retreat.  They appeared
to agree, that while Elected Official 2 did not pose a threat to
their group, they nonetheless felt that there was not a good
enough reason to "have the family meeting with him."  The
continued exchange between Political Consultant 1 and AMENT is
striking in that it appeared to show how they wielded
significant influence over several of the elected members of the
Anaheim City Council.  For example, they discussed the ability
to summon Elected Officials 1, 3, and 4 to the retreat;
Political Consultant 1 talked about how they, "got [Elected
Official 4] reelected" and "expect [Elected Official 4] to be a
loyal member of the team;" and Political Consultant 1 said that
they would "give him the Mayor Pro Tem and tell him he's always
gonna be our number one guy."  I believe that these statements
spoke not only of Political Consultant 1's and AMENT's ability
to cause members (in this case, Elected Official 4) to be
elected to the council, but also their continued influence over
those same council members even after they had attained public
office.  I believe that this further exhibits the influence the
covert group had, particularly over the elected officials, in
that Political Consultant 1 and AMENT appeared to have the power
to summon Elected Official 1 at their whim, and "give" Elected

Official 4 the Mayor Pro Tem[20] position -- a position that neither Political Consultant 1 nor AMENT could "give" without having influence over members of the Anaheim City Council in their official capacity as Councilmembers.[21]

18.  A short time later, during the same intercepted telephone call, as Political Consultant 1 and AMENT continued to discuss reasons against inviting Elected Official 7 to the retreat of the "family" or "cabal," they had the following exchange:

AMENT:   To me, I don't think [Elected Official 7], I think this would be a lot for him to absorb in his first week [as an elected member of the Anaheim City Council].  It's kind of like when S.O.A.R. took how the sausage was made to the S.O.A.R. Board to show them how polling works and how we manipulate it.  That's when half of S.O.A.R. kind of went off the deep end.

PC1:     [Laughs]

AMENT:   [UI] We're part of the manipulation.  I think it's too early for [Elected Official 7] to get into this level of detail.

_____

[20] Mayor Pro Tem is a commonly used shorthand term used to reference the full term "Mayor Pro Tempore".

[21] According to https://codelibrary.amlegal.com/codes/anaheim/latest/anaheim_ca/0-0-0-51937, last visited on May 13, 2022, Section 504 of the Anaheim Municipal Code reads, in part, "The City Council shall designate one of its members as Mayor Pro Tempore, who shall serve in such capacity at the pleasure of the City Council. The Mayor Pro Tempore shall perform the duties of the Mayor during the Mayor's absence or disability."

PC1:        Yeah, I agree.

19.  Based on my training and experience, including my
knowledge of this investigation to date, I believe that AMENT
and Political Consultant 1 continued to discuss reasons against
inviting certain members of the Anaheim City Council in their
upcoming retreat, including Elected Official 7.  In order to
illustrate his stance on Elected Official 7, AMENT appeared to
compare an incident involving S.O.A.R.  S.O.A.R. is an acronym
for Support Our Anaheim Resort.  S.O.A.R. is a coalition of
Anaheim business owners, community leaders, and Anaheim
residents, which also has a Political Action Committee ("PAC").
S.O.A.R. has an advisory committee consisting of approximately
nineteen members, which included AMENT.[22]  Based on my training
and experience, including knowledge of this investigation to
date, I know that lobbyists, consultants, and those advocating
for certain public policies will, in an attempt to show public
support for their viewpoint or policy objectives, commission and
fund polls.  I suspected, at the time, that the polls might have
been tools that were manipulated by those commissioning them in
order to produce positive poll results.  The positive poll
results would then be used by the poll sponsors to show the
public and elected officials that their policies were supported,
when, in fact, they may not have been. Based on AMENT's
statement that "we manipulate it" in reference to polls, I
believe that AMENT confirmed my suspicion about manipulated

---

[22] According to www.soaranaheim.com, last visited on April
28, 2022.

polls.  Specifically, I believe that AMENT and Political Consultant 1 acknowledged their role in manipulating polls for S.O.A.R. in this fashion.  Furthermore, AMENT's example of his and Political Consultant 1's role in manipulating polls for S.O.A.R., and the apparent reaction of the S.O.A.R. Board of Directors as having gone "off the deep end" after learning of such manipulation, is an example given by AMENT to show that Elected Official 7 may have the same reaction if brought into "the cabal" where he would see how "the sausage is made."

20.  Towards the end of this monitored telephone call, Political Consultant 1 and AMENT agreed to extend invitations to the covert retreat (beyond the list of individuals previously identified above) to only Elected Officials 3 and 4, so as to, in AMENT's words, "keep the family close."

21.  On November 30, 2020, at approximately 10:38 a.m., monitoring agents intercepted an incoming call on Target Phone 1 from a phone number believed to be used by Elected Official 1.[23] During the phone call, Political Consultant 1 informed Elected Official 1 that the upcoming retreat would take place on Wednesday (December 2, 2020) and that he (Political Consultant 1) and AMENT were still working on the agenda for the retreat.

---

[23] According to www.lexisnexis.com, last visited on July 23, 2021, the phone number intercepted over Target Phone 1 is subscribed to by Elected Official 1.  Additionally, cooperating witnesses, including AMENT, have identified this number as being used by Elected Official 1.  Furthermore, based on a voice comparison of recordings of the Anaheim City Council, which I reviewed via www.anaheim.net on March 7, 2021, and the audio of this phone call intercepted over Target Phone 1, I believe the user of this phone number is Elected Official 1.

After Political Consultant 1 informed Elected Official 1 ("EO1") of this, they had the following conversation:

EO1:     Did you invite [Elected Official 7 and Elected Official 2]?

PC1:     No, I talked about it with Todd [AMENT] and [Company A Employee]; we felt like for this first one we'll kinda keep things big picture and stick with um, with um, [Elected Official 4] and [Elected Official 3].  And part of what we'll talk about is our plan to manage our relationship, you know particularly with [Elected Official 2].  I think [Elected Official 7] is gonna be fine on everything.  But um, [Elected Official 2's], you know, I think he's on the team, but he's just gonna take some management because he's got competing pressures and things so um--

EO1:     Oh yeah yeah, he will, I mean you can already see some of them like he wants to do the um, take care of the health issues in Anaheim--

PC1:     Right.

EO1:     --right away, I mean I saw that article what he gave an interview with.

PC1:     Right.

EO1:     So, which is basically fine, we can, you know, we can put a team together, health team, hard to

18

> handle that, but will take away from [Elected
> Official 6].

PC1:    Right, exactly, which is what [Elected Official
        2] told me he was trying to accomplish, and I
        said, "yeah, let's talk about it before you say
        it next time, but yes I appreciate that, so."

EO1:    Yeah, at least put him and, uh, maybe [Elected
        Official 5] in there and I could be part of it,
        you know, three of us.

PC1:    Right.

EO1:    Yeah, so take it away from everything from what
        [Elected Official 6] wants to do, so, okay
        alright.

22.  Based on my training and experience, including my
knowledge of this investigation to date, I believe that this
exchange between Political Consultant 1 and Elected Official 1
was in reference to the covert retreat of "the family."
Furthermore, I believe AMENT and Political Consultant 1, and to
some extent, Company A Employee, were the ringleaders of this
group, as Political Consultant 1 told Elected Official 1 that he
and AMENT were working on the agenda for the retreat, and that
he had discussed with AMENT and Company A Employee the retreat's
attendees.  Finally, as it related to the elected public
officials who appeared to be members of "the family" (Elected
Officials 1, 3 and 4), I believe that Elected Official 1 may
have been the more influential of the three because of his
position within the City Council, and because Political

Consultant 1 appeared to discuss the logistics of the retreat and the "management" of other City Council Members with Elected Official 1 rather than with Elected Officials 3 or 4 over Target Phone 1.

23.  I believe that the context in which this covert group existed -- seemingly orchestrated by Political Consultant 1 and AMENT, with input from Company A Employee -- and the significant influence the group appeared to wield among various City of Anaheim officials, explained why Political Consultant 1 and AMENT had been successful in orchestrating the schemes described herein.  Furthermore, I believe that Political Consultant 1 and AMENT used their positions and influence within Firm A and the Chamber, respectively, to facilitate the schemes described in further detail below.

　　　　2.　Political Consultant 1 and AMENT's Use of Firm A and the Chamber, Respectively, to Conduct Suspicious Financial Transactions as a Means to Achieve Certain Goals, Including Concealment

24.  Monitoring agents intercepted multiple phone calls between Political Consultant 1 and other individuals that highlighted just how the Chamber and Political Consultant 1's Firm A, at the direction of AMENT and Political Consultant 1 respectively, operated.  Based on the following calls, it appeared that AMENT and Political Consultant 1 operated the Chamber and Firm A, in part, to move funds back and forth so as to facilitate certain goals and relationships.  I believe that their unique positions -- AMENT at the time being President and CEO of the Chamber, and Political Consultant 1 being CEO of Firm

A -- aided, at least in part, in establishing their influence
over Anaheim as described earlier.

25.   On November 13, 2020, at approximately 9:06 a.m.,
monitoring agents intercepted an outgoing call from Political
Consultant 1, using Target Phone 1, to AMENT, using Target Phone
2.  During the call, the two had the following conversation:

PC1:      On any of the old stuff that is sort of in a grey
          area between chamber PAC and chamber, do you have
          a preference that chamber versus chamber PAC pay
          it, and you know, and keep money in the PAC, or--

AMENT:    Yeah, I mean that's fine.

PC1:      Cause that preserves PAC money and you guys, I'm
          presuming like in some of those cases that you
          guys never booked it as unpaid expenses on your
          PAC reporting so--

AMENT:    Correct.

PC1:      So you would have to go back--
          [OV]

AMENT:    [UI] this year or adjust the past.

PC1:      Yeah, are going to have to go back and amend a
          bunch of old PAC reports so.

AMENT:    Don't want to do that.

PC1:      Ok, then let's, um, I'm just going to tell her to
          pay them all from the chamber and we'll just
          adjust on our end.

AMENT:    And then we'll figure out how to deal with the
          PAC.

```
PC1:       Yeah [UI]

           [OV]

AMENT:     Any checks that we can control including [XY][24]

           and others that we'll just move to chamber.

PC1:       Yeah perfect ok.

AMENT:     Alright.
```

26.   Based on my training and experience, including my
knowledge of this investigation to date, I believe that AMENT
and Political Consultant 1 were discussing financial matters
occurring between the Chamber and a PAC that was supportive of,
or affiliated with, the Chamber.  According to a website
operated by the City of Anaheim, which makes campaign finance
information available to the public, I found that the Anaheim
Chamber of Commerce Political Action Committee ("the Chamber
PAC") has existed since approximately 1990.  Furthermore,
according to a Form-460[25] filed for the Chamber PAC on October
22, 2020, AMENT was listed as the Chamber PAC's Treasurer.  I do
not know what Political Consultant 1's official role is, if any,
in the Chamber PAC; however, based on the nature of this phone

---

[24] I believe AMENT made reference to a company located in
Anaheim by stating two individual letters -- the letters, which
make up a portion of the company's actual name.  For purposes of
anonymity I have replaced the actual letters AMENT uttered
during this conversation, with the letters "XY."

[25] According to California's Fair Political Practices
Commission (https://fppc.ca.gov/content/dam/fppc/NS-
Documents/TAD/Campaign%20Forms/460.pdf, last visited on April
28, 2022), the California Form 460 is used by all recipient
committees, including, "A person, entity, or organization that
receives contributions totaling $2,000 or more during a calendar
year to support or oppose various candidates and measures (e.g.,
political parties, political action committees)."

call, I believe that at the time he had, at least, an unofficial role in determining how the Chamber and the Chamber PAC spent their funds.  Furthermore, regarding AMENT's statement that "[a]ny checks that we can control including [XY] and others that we'll just move to chamber": I believe that "[XY]" is a reference to the aforementioned company with offices located in Anaheim,[26] and according to bank records obtained and reviewed by FBI FoA Katherine Ramirez, it appears that checks from XY have been deposited into AMENT's TA Consulting account.[27]  I believe that AMENT's use of the word "control" in the conversation above may mean that he and Political Consultant 1, at one time, had the ability to deposit certain funds they received into different accounts based not on the intent of the issuer of said checks or the needs of the receiving entity, but where AMENT and Political Consultant 1 may have needed the funds at the time. In addition to Political Consultant 1's alleged role in the Chamber and the Chamber PAC finances, I believe that Political

---

[26] According to XY's company website, last visited on April 28, 2022.

[27] I believe that AMENT and Political Consultant 1, at one point, had a close relationship with SA Recycling through its corporate counsel ("SA Counsel").  During the course of this investigation, I made contact with SA Counsel at the offices of SA Recycling.  Based on monitored phone calls subsequently intercepted over Target Phone 2, I believe that SA Counsel disclosed my contact with him and SA Recycling in general, providing specific information I disclosed to SA Recycling pertaining to this investigation to AMENT.  SA Counsel's notification to AMENT occurred despite the government's request that the existence of the contact not be disclosed.  The government further requested to be given advance notice if any such disclosure was to occur.  To date, neither SA Counsel nor anyone affiliated with SA Recycling has notified the government of SA Counsel's disclosure to AMENT.

Consultant 1 also used his Firm, Firm A, as a means to move funds back and forth between Firm A and the Chamber in a manner that blurred the line between the Chamber (a 501(c)(6)[28] organization as indicated by the Chamber's 2018 Form 990 - Return of Organization Exempt From Income Tax form[29]) and Firm A.

27.   On November 10, 2020, at approximately 4:00 p.m., monitoring agents intercepted an incoming phone call from a phone number believed to be used by an employee of Firm A ("Firm A Employee 1").[30]   During the phone call, Political Consultant 1, using Target Phone 1, and Firm A Employee 1 discussed several financial and accounting matters, including a brief discussion highlighting the financial relationship between the Chamber and Firm A.   During that portion of the call, Political Consultant 1 and Firm A Employee 1 ("FE1") had the following conversation:

FE1:      Do you want me to take care of that Anaheim Chamber, we pay them they pay us that large [UI].

PC1:      No I need to, I need to, I will try to do it on Thursday with them.   We've had three days where, you know, I was going to go over all of that with

---

[28] According to www.irs.gov, 501(c)(6) is a tax exempt status that "provides for exemption of business leagues, chambers of commerce, real estate bonds, boards of trade, and professional football leagues…which are not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

[29] https://apps.irs.gov/pub/epostcard/cor/950494110_201812_990O_2020061117187368.pdf, last visited on April 28, 2022.

[30] According to www.lexisnexis.com, last visited on July 23, 2021, the phone number intercepted over Target Phone 1 was subscribed to by Firm A Employee 1.

```
                    Todd [AMENT] and Wendy and then something always

                    comes up and we don't get to it.

        FE1:        Ok.

        PC1:        Um, but yes, I, I will try again on that on

                    Wednesday, I mean on Thursday with them.  Um, and

                    you know, cause they had some questions about our

                    accounting and um, and um, but yeah, I, I, but

                    they're, but they're really close to the same

                    amount so at the end of the day it's just moving

                    money back and forth but it will clear a lot of

                    shit off of our books too.

        FE1:        Right, yeah, hoping to do that.
```

28.  Based on my training and experience, including my knowledge of this investigation to date, I believe that this brief exchange between Political Consultant 1 and FE1 illustrates the ease with which Firm A and the Chamber were able to move funds back and forth.  I believe that this example illustrates how Political Consultant 1 and AMENT used Firm A and Chamber accounts to keep money in both accounts, especially when Political Consultant 1 stated, "at the end of the day it's just moving money back and forth."  I believe that this dynamic is important to show how AMENT and Political Consultant 1 were able to orchestrate the fraudulent schemes detailed below with such ease.  I believe that there may have been additional schemes, in addition to those that form the basis for this Complaint, where AMENT and Political Consultant 1 may have used Firm A and the

Chamber to facilitate the movement of funds to accomplish certain goals, as described below.

29.   On December 1, 2020, at approximately 11:01 a.m., monitoring agents intercepted an incoming call over Target Phone 1 from a political consultant ("Political Consultant 2").[31] During their phone call, Political Consultant 1, using Target Phone 1, and Political Consultant 2 ("PC2") appeared to discuss the success of certain contracts throughout California, at which point they had the following exchange:

PC2:      Speaking as far as funders go on the construction and labor side.  It's always easier to get those guys to pay into something that already exists.  Which is why when I talked to you before about funneling the money through, you know, whatever, either setting up a (c)(3) or a (c)(4) or just having the money go through.

PC1:      Yeah, we have existing ones, so we have the Anaheim Economic Development Corporation.

PC2:         Right.

PC1:      Which is a (c)(3), it's really run and managed by the Chamber, but as you know my office down here, we work out of the Chamber.

PC2:         Right.

PC1:      And so, we have complete control over that, so if

---

[31] Based on the phone number intercepted over Target Phone 1, the nature of the phone call, and www.linkedin.com, I believe the phone number was used by the CEO of a political consulting company.

they put money in there we would know that it
would go to this project, and to uh, and to pay
the consultant that's running the program.

PC2:        Right.  Cause for me it's difficult for me to
say, you know, we're gonna need X amount of money
to fund the thing, and X amount of money for
political representation, they just don't get
that.  Like they think that their local people or
their representatives should be able to do it
all, and they just can't.  You know what I mean?
They just can't bring the same level of
representation and authority down as paid
consultants can, and so if we can get them to not
only -- to distribute money not only to pay for
the funds, but also to pay for your and mine
services, um, through another third party, I
think that would be the way to go.

PC1:        Got it, okay.

30.  Although I am unfamiliar with the true relationship,
from a business sense, between Political Consultant 1 and the
political consultant as it pertains to this phone call, I
believe that, based on the contents of the phone call, the
political consultant may be representing a client, or clients,
from whom he needed to obtain funds in order to achieve a
desired outcome on their behalf.  Specifically, the political
consultant stated to Political Consultant 1 that "it's difficult
for [him] to say" that he will need a certain amount of money to

fund the project, pay for political representation, and also pay for his and Political Consultant 1's services, further explaining to Political Consultant 1 that the clients "just don't get that." Based on this statement, I believe that the political consultant (possibly with the assistance of Political Consultant 1) was representing a client who was reluctant to pay for all the services the political consultant just listed. Of particular note is reference to "money for political representation." I believe that Political Consultant 1 and the political consultant discussed ways in which they could solicit funds from the client, then use a "(c)(3)" or "(c)(4)," which I believe were references to non-profit 501(c)(3) or 501(c)(4) entities, as a means to "funnel" the money in a manner intended to obfuscate the true destination of the final payments, namely, "political representation," project funding, and consulting services. Finally, perhaps the most notable comment was Political Consultant 1's admission that he had an "existing…(c)(3)" named the "Anaheim Economic Development Corporation," which was "run and managed by the Chamber," but that Political Consultant 1 had "complete control over." Political Consultant 1 concluded by explaining to the political consultant, in reference to the "(c)(3)" that he controlled, but that is officially "run and managed by the Chamber," that "if [the client] put[s] money in [the (c)(3)] we would know that it would go to this project, and . . . to pay the consultant that's running the program." Based on this exchange, I believe that Political Consultant 1 was offering the political consultant a

means by which the political consultant could move funds through
the Anaheim Economic Development Corporation in order to pay
consultants, and perhaps elected public officials, without the
knowledge of the client.

### 3. AMENT, Political Consultant 1, and Company A Employee Used Their Influence to Script Statements Made by Elected Official 1 at an Anaheim City Council Meeting

31.  Based on intercepted communications over the Target
Phones, monitoring agents have intercepted calls and text
messages that further illustrated the control AMENT and
Political Consultant 1 exerted over the workings of the Anaheim
government.  For example, intercepted communications revealed
that Political Consultant 1 drafted a script (which I believe
was accomplished, in part, with input from AMENT and Company A
Employee) for Elected Official 1 to deliver at an Anaheim City
Council meeting that occurred on March 23, 2021, and crafted
language found on the Anaheim City Council Consent Calendar for
the same meeting.

32.  AMENT, Political Consultant 1, and Company A Employee
engaged in conversations amongst themselves, and with Elected
Official 1, regarding Elected Official 1's planned comments
related to an Anaheim bond measure.  Intercepted communications
appeared to indicate that Political Consultant 1 was responsible
for writing a script to be delivered by Elected Official 1 at
the City Council meeting.  Political Consultant 1 appeared to
obtain input from Company A Employee and AMENT in this endeavor.
Multiple drafts of this script were sent back and forth between

Political Consultant 1 and Elected Official 1's assistant related to this bond measure.

33.   On March 23, 2021, just hours before the City Council meeting, Political Consultant 1 received an incoming text message from Elected Official 1's assistant that read, "Please let me know if there are any further changes to [version 6] of [Elected Official 1's] Comments on Item #2."  Political Consultant 1 replied, via text message, "[Company A] asked to delete reference to [Company A's parking lot].  Will send to you."  I have reviewed Elected Official 1's comments related to Item #2 on the Anaheim City Council consent calendar during the March 23, 2021 meeting and did not hear him reference Company A's parking lot.[32]

34.   Later that evening, likely during the City Council meeting, which was being live streamed, an incoming text message from Company A Employee to Political Consultant 1 was intercepted.  Company A Employee's text read, "[Elected Official 1] reads your script so poorly."  Political Consultant 1 replied, "Lol," followed by, "He doesn't practice."

35.   I believe that this section helps to illustrate (1) the nature and origin of Political Consultant 1's and AMENT's influence over the City of Anaheim at this time, particularly through their influence over "the cabal" or "family"; and (2) the methods with which Political Consultant 1 and AMENT used Firm A and the Chamber, respectively, to

_____

[32] According to https://www.anaheim.net/2142/View-City-Council-Meetings, last visited on April 28, 2022.

facilitate certain strategic and financial goals.  As will be
described in the following section, AMENT and Political
Consultant 1 appeared to abuse their roles, which resulted in
personal financial gain for AMENT and others.

**B.    The Fraudulent Cannabis Scheme and the Defrauding of
       the Cannabis Client by AMENT and Political Consultant
       1.**

1.    Background on the Chamber's Involvement in
      Crafting a Cannabis Ordinance for Anaheim and
      CW1's Cooperation with the FBI

36.   In 2018 and 2019, prior to CW1's cooperation with the
FBI, CW1 was under investigation for engaging in corrupt
activities, including soliciting bribes from CHS1 and CHS2, who
at the time owned a cannabis company.  CHS1 and CHS2 do not own,
nor are they in any way affiliated with, the Cannabis Client
involved in the scheme alleged herein.

37.   CHS1 and CHS2 hired CW1 as their cannabis consultant
in 2018 for the purpose of securing favorable laws for their
cannabis company in the City of Irvine.  Shortly after CHS1 and
CHS2 retained CW1, CW1 began to devise a scheme whereby CW1
would solicit money from CHS1 and CHS2 with the intention of
paying bribes to two elected members of the Irvine City Council
in exchange for the Council Members performing official acts,
resulting in the passage of favorable cannabis laws.  CHS1 and
CHS2 operated at the direction of the FBI during the City of
Irvine scheme.

38.   CHS1 and CHS2 performed multiple recorded
conversations with CW1 at the direction of the FBI, both in
person and over the phone.  As a result, the FBI obtained

authority for Title III interception, for a period of thirty days, over CW1's phone from approximately June 24, 2019 through July 23, 2019.

39.  A short time after the Title III coverage on CW1's phone had ended, CHS1 learned that CW1 had an opportunity to assist CHS1 in establishing CHS1's cannabis business in the City of Anaheim.  At the direction of the FBI, CHS1 met with CW1 and CW1's Associate to discuss the Anaheim matter on September 5, 2019.  CHS1 was equipped with an FBI recording device, which CHS1 used to record the meeting.  During the meeting, CW1's Associate ("CW1 Asso") explained the following to CHS1:

> CW1 Asso: Exactly.  So now we've found the middle ground scenarios, which now is presenting itself in Anaheim.  Middle ground.  There's people who want money.  Big money, because it's fucking Anaheim.  Chamber people, people like that all over the place, whatever, consulting groups, and they're not saying we're going to guarantee a license.  Now we listen, oh, you're not going to guarantee me a license?  Perfect.  What are you going to guarantee me?  We'll let you write the buffers, tell us how you want the ordinance drafted, tell us how, not that we're going to not let everybody play, everybody gets to participate, but if you say you have a building and its 650 feet from residential…whatever, you want it that way, we'll make it that way…but then, once we open that baby

up, then everybody can come in…But you just get

all the input.  You tell us you, we want this, it

goes in the ordinance.[33]

40.   Based on my training and experience, including my

knowledge of this investigation to date, I believe that CW1's

associate was explaining to CHS1 that in exchange for a large

amount of money, CW1 and CW1's associate would be able to work

with stakeholders in Anaheim, including the Chamber, and allow

CHS1 to draft a cannabis ordinance in a manner that would be

favorable to CHS1's company.

41.   A short time later during the same recorded meeting,

the following exchange occurred:

CW1 Asso: But the Chamber is a vehicle.

CW1:      Yeah.

CW1 Asso: They're just there to drive political cover and

          give the policy makers what they need as far as

_____

[33] CW1's associate was interviewed by the FBI on May 10,
2021 regarding his/her representation of a cannabis company and
their interaction with AMENT and Political Consultant 1.  CW1's
associate corroborated a number of details previously reported
by CW1, including evidence CW1 collected via consensual
recordings.  However, CW1's associate did not disclose
conversations he/she had with CHS1, which are detailed herein.
I am not relying on the statements that CW1's associate made to
the FBI on May 10, 2021.  Subsequent to CW1's associate's
interview with the FBI, CW1's associate contacted the United
States Attorney's Office, through counsel, in an effort to offer
assistance and provide information related to corruption.
However, this contact occurred within hours of a meeting with
CW1, during which the government disclosed surreptitious
recordings of CW1 and CW1's associate.  Therefore, I believe CW1
tipped off CW1's associate to the existence of this portion of
the investigation, further calling into question CW1's
trustworthiness.  CW1's associate has not been interviewed since
May 10, 2021.

ammunition to deal with the loud mouth haters
that are out there.

42.  Here, CW1 and CW1's associate explained the role of
the Chamber to CHS1.  Based on my knowledge of this
investigation to date, I believe that their explanation of the
Chamber being a "vehicle" was accurate.  The three of them
continued to discuss several different aspects of the matter, to
include the amount requested of CHS1, which appeared to
fluctuate between $200,000 and $300,000, how the money was to be
delivered to the Chamber (cash or check), and who was to be paid
with the money, which, according to CW1 and CW1's associate,
included the two of them (CW1 and CW1's associate), lobbyists,
consultants, the Chamber, and possibly elected officials.  A
short time later during the same recorded meeting, the following
exchange occurred:

CHS1:     So who is it, who's [Firm A]?

          …

CW1 Asso: It's [Firm A].

CW1:      [Firm A].

CW1 Asso: But that's just the one consultant.  They're not
          taking any of the cash or anything.  They're just
          the ones that tell you who to go talk to.

CHS1:     [laughs]

CW1 Asso: Yeah, oh yeah, it's layered.

43.  Based on my training and experience, including my
knowledge of this investigation to date, I believe that CHS1 was
asking for the name of Firm A that was going to assist CHS1 with

the Anaheim cannabis ordinance if CHS1 agreed to pay the
requested money.  In response, CW1 and CW1's associate replied
that it was Firm A.  CW1's associate further explained that Firm
A would not directly receive CHS1's cash and that "it's
layered."  Based on my knowledge of this investigation to date,
and which will be illustrated in further detail below, I believe
that CW1's associate was explaining that someone else would
officially receive the payment from CHS1 (which I believe to be
the Chamber), followed by an attempt to launder money to Firm A
and others through a series of financial transactions, or as
CW1's associate put it, a "layered" plan.

44.  The FBI reviewed the recording from September 5, 2019,
and at the direction of the FBI, CHS1 requested an in-person
meeting with management at the Chamber to discuss the Anaheim
ordinance proposal.

45.  On September 18, 2019, CHS1, CW1, and CW1's associate
traveled to the Chamber's office.  CHS1 was equipped with an FBI
recording device that captured the meeting in its entirety.
Additionally, members of an FBI surveillance team saw CHS1, CW1,
and CW1's associate, arrive for the meeting, and later depart
the meeting.  I participated in the surveillance.

46.  The following summary is based on the recording that
CHS1 captured.  At the September 18, 2019 meeting, CHS1 was
introduced to Political Consultant 1 and AMENT.  Political
Consultant 1 and AMENT provided CHS1 with their business cards,
which contained Political Consultant 1's phone number and
AMENT's phone number, respectively.  AMENT and Political

Consultant 1 explained that the Chamber routinely spends millions of dollars to ensure business friendly candidates are elected to the Anaheim City Council.  AMENT explained that the Chamber creates business friendly policy, and then hires Firm A to interact with the elected officials to ensure business friendly policy is adopted by the City Council.

47.  According to CW1 and open source internet searches, to include a Google search last conducted on May 2, 2022, the Chamber and Firm A were, at all times throughout this affidavit and currently, located in the same office (occupying different suites), in addition to non-profit entities, including Visit Anaheim.

48.  During the September 18, 2019 meeting, AMENT and Political Consultant 1 told CHS1 that they were working with CW1 and CW1's associate to introduce a retail cannabis ordinance in Anaheim and that they (AMENT and Political Consultant 1) had created a cannabis task force within the Chamber ("the Task Force").  Furthermore, AMENT and Political Consultant 1 explained that if CHS1 wished to be involved in the Task Force's project, CHS1 would gain access to information concerning how many cannabis retail licenses would be available, and where dispensaries would be allowed within the City of Anaheim.  Furthermore, access to this knowledge would be gained *before* the general public, and *only* to those cannabis companies willing, and financially able, to pay $350,000, the amount requested of CHS1 by Political Consultant 1, in the presence of AMENT, "to contribute to the effort."

49.   Based on my training and experience, I believe that access to this knowledge would have been incredibly valuable because it would have afforded CHS1's company, and others who agreed to pay the requested fee, a significant strategic advantage over their competitors and other members of the public.   This advantage would allow them to purchase or lease locations identified in the proposed ordinance, at a significantly lower cost, before an increase in property values and rental costs occurred as a result of the cannabis ordinance. Conversely, those companies that paid for access to the Task Force would likely attempt to influence the drafting of a future cannabis ordinance to define borders that would include properties already owned by the companies.   Furthermore, I believe that Political Consultant 1 and AMENT were aware that this information was incredibly valuable, given that they were requiring CHS1, and others, pay the large amounts of money for it.

50.   During the same recorded meeting on September 18, 2019, the following conversation took place:

PC1:       There's an issue.   Anaheim has a lobbying
           ordinance.   So if you write a check to us we'd
           have to register as your lobbyist for [CHS1 and
           CHS2's company].

CHS1:      And is that beneficial for you or me?   Or is it
           the opposite?

           …

37

PC1:        It's not a good or bad thing, it would prove
            influence.  That umm, that umm.

CHS1:       When you walk into a room, you represent me.  Is
            that beneficial for the industry or a detriment?

PC1:        I think it's beneficial for the industry and I
            think it's beneficial for you.  But there is, at
            the moment.  The Anaheim lobbying ordinance says
            that at the moment we are entitled to receive
            payment for influence to public policy outcome in
            Anaheim, we have to. . .

CHS1:       Register.

PC1:        Within, like a week, register with the city.  So
            there are people who pay attention to that stuff.
            When it finally comes across the desk at the city
            clerk's office saying that [CHS1's company] hired
            [Firm A] in this context because of all the
            relationships that we have.  You know, that will
            trigger some things.

CHS1:       Got it.

51.  Based on my training and experience, including my
knowledge of this investigating to date, I believe that the
above exchange is evidence that Political Consultant 1 and AMENT
were acting in concert to initiate their fraudulent scheme.
AMENT and Political Consultant 1 appeared to be attempting to
obfuscate the true nature of their relationship with the
companies willing to pay to be a member of the Task Force.  I
believe this obfuscation was critical to the scheme because if

"people who pay attention to that stuff" had learned that Firm A was, in fact, being paid by cannabis companies rather than the Chamber, further questions may be asked of Firm A, which may uncover the amount, and movement, of money into the pocket of AMENT and other entities controlled by Political Consultant 1 (described in further detail below).

52.   A short time later during the same recorded conversation, the following exchange took place:

PC1:      But that's my point.  What we don't want is
          eighty-seven other people at the table.  You
          know, trying to either influence the work that
          we're doing, or start lobbying city council
          members.  Cause we can keep it pretty tight.  But
          if there's fifty people chasing this before we've
          got it locked down.  Umm, so as we talk this out,
          umm, if you're ok with it.  You know, I say we
          just run it through the Chamber task force.
          …

CHS1:     I was just going to ask that.  Like if we run it
          through the Chamber then we don't have to
          register you as a lobbyist.

PC1:      And then I'm not advocating for you.

CHS1:     Right.  Then you're just doing the greater
          good.

PC1:      You're just helping the Chamber do its good
          public policy work.

CW1:      Yep.

39

```
PC1:      On its behalf.

CHS1:     That seems more reasonable to me.  I. . .

AMENT:    This is, this is the dispensary guys.

CHS1:     Right.

AMENT:    Investing in the Chamber.
```

53.  Based on my training and experience, including my knowledge of this investigation to date, I believe that once again Political Consultant 1 was attempting to conceal Firm A's relationship to the cannabis companies willing to pay for access to the Task Force.  This time, however, I believe that Political Consultant 1 described his motivation for secrecy by stating he did not want "eighty-seven other people at the table."  I believe that Political Consultant 1 wanted to avoid that number of competing cannabis companies "at the table" because it would significantly decrease his and AMENT's ability to charge such a high premium to access the Task Force's information, given that such a large number of companies would have access to the same information.  This time, AMENT exhibited his knowledge and willingness to obfuscate Firm A's relationship to the cannabis companies when AMENT agreed with Political Consultant 1 that a payment directly to the Chamber would give the appearance that CHS1's company was merely "investing in the Chamber." Furthermore, and perhaps even more important, was AMENT's statement to CHS1 that this would be "the dispensary guys…investing in the Chamber."  In other words, AMENT was representing to CHS1 that the money would go to the chamber, not to AMENT personally.

54.   CHS1 and CW1's associate exited the Chamber building at the conclusion of the meeting.  While in the parking lot of the Chamber's office, CW1's associate informed CHS1 that the Chamber was soliciting money from other interested cannabis companies and that the Chamber's goal was to collect a total of $1,000,000 from the cannabis companies.

55.   On October 28, 2019, CW1 was arrested on a complaint (based on the 2018 corruption scheme involving Irvine officials) and subsequently brought to the FBI office in Orange County where CW1 was interviewed.  CW1 agreed to cooperate with the FBI during CW1's interview.  The complaint was dismissed without prejudice based on the government's motion.  CW1 has been assisting the FBI since the date of his/her arrest.

56.   During CW1's interview on October 28, 2019, CW1 explained that the Chamber in Anaheim did not work like a traditional Chamber of Commerce in other cities.  In Anaheim, the Chamber is a lobbying organization that writes and introduces policy to the Anaheim City Council.  CW1 identified the Cannabis Client as a client whom CW1 was representing in his/her efforts with Anaheim and the Chamber.  At this time, the Cannabis Client had already paid the Chamber $225,000, at the request of AMENT and Political Consultant 1, in exchange for access to the Task Force, which CW1 has subsequently described as an illusion and an entity that was created just for show.  CW1 and the Cannabis Client were of the understanding that they would help craft language that would be incorporated into the cannabis ordinance by the Task Force, and presented to the

Anaheim City Council for approval.  The funds paid to the
Chamber by the Cannabis Client were also to be used to pay for
certain expenses, including research, polling, and focus groups.
According to CW1, AMENT and Political Consultant 1 solicited the
funds from the Cannabis Client using the same pitch they used on
CHS1 on September 18, 2019, as captured during the recording
conducted by CHS1 described above.

57.  Based on my knowledge of this investigation, I believe
the Cannabis Client paid the $225,000 because they relied on
representations made by Political Consultant 1 and AMENT to CW1,
who was acting as the Cannabis Client's representative, that
their payments would be used to conduct polling and focus
groups, and would give them access to the Task Force in crafting
a cannabis ordinance, which would subsequently be introduced to,
and passed by, the City of Anaheim.  However, as will be
explained in further detail below, Political Consultant 1 and
AMENT engaged in material misrepresentations regarding the
intended and actual use of the Cannabis Client's money.
Additionally, as will also be explained in further detail below,
Political Consultant 1 and AMENT omitted information regarding
how a portion of the Cannabis Client's money had been spent,
namely, as direct kickbacks to AMENT personally, through the use
of Political Consultant 1 and Firm A as a laundering mechanism.

58.  I further believe that Political Consultant 1 and
AMENT owed a duty to CW1 and the Cannabis Client because of the
nature of the relationship Political Consultant 1 and AMENT had
with CW1 and the Cannabis Client.  Furthermore, while not the

focus of this Complaint, I believe AMENT owed a duty to the Chamber to be a good steward of the Chamber's finances due to his position as President of the Chamber.  I believe Political Consultant 1 and AMENT defrauded CW1 and the Cannabis Client by affirmatively lying about how the Cannabis Client's funds would be used and omitting material facts about how they would be used (*i.e.*, payments to AMENT via Firm A).  Furthermore, I believe AMENT breached his duty to the Chamber by embezzling Chamber funds with the assistance of Political Consultant 1 and the use of Firm A as a means to conceal the embezzlement.

        2. <u>The Cannabis Client Made Three Separate Payments to the Chamber, Portions of Which Were Then Sent to Firm A, and Then Immediately Back to AMENT.</u>

59. Based on an analysis of bank records, and interviews of the Cannabis Client, CW1, and CW1's associate, the FBI has determined that the Cannabis Client made three separate payments to the Chamber.  Based on information provided by CW1, and conversations CHS1 and CW1 have recorded at the FBI's direction with Political Consultant 1 and AMENT, I believe that the following payments made by the Cannabis Client to the Chamber were done as a result of Political Consultant 1's and AMENT's solicitation in furtherance of their scheme.  The Cannabis Client's payments to the Chamber, and subsequent movement of portions of the funds, were as follows:

a.   On July 17, 2019, the Chamber's bank account[34]
received an incoming wire from the Cannabis Client[35] in the
amount of $85,000.[36]  The next day, on July 18, 2019, the Chamber
wrote a check to Firm A in the amount of $20,000.  Contained in
the memo section of the check was "Research & consulting on
cannabis."  That same day, a check in the amount of $16,000 was
drawn from a Firm A bank account and made payable to "TA
Consulting."  The check was deposited into an account titled
"Todd Ament Sole Prop dba TA Consulting."  Around the time of
the deposit, a portion of the funds were transferred to a
personal checking account held jointly by AMENT and another
individual ("Person A"), which then were apparently used to make
quality of life purchases for AMENT and Person A ("Transaction
#1").

b.   On October 3, 2019, the Chamber's bank account
received an incoming wire from the Cannabis Client in the amount
of $70,000.

c.   On October 15, 2019, the Chamber's bank account
received an incoming wire from the Cannabis Client in the amount
of $70,000.  The next day, on October 16, 2019, the Chamber

---

[34] The FBI received bank account records from Pacific
Western Bank located in Carlsbad, CA.  The name on the account
is Anaheim Chamber of Commerce Ambassadors, and the address
associated with the account it 2099 S State College Blvd #650,
Anaheim, CA 92806-6142.

[35] Based on bank records, information provided by CW1, and
the Cannabis Client, the FBI was able to determine that the
incoming wire originated from the Cannabis Client.

[36] Based on my training and experience, I know that wire
transactions are processed by the Fedwire, a system run by the
United States Federal Reserve Banks, and these wire transactions
generally travel in interstate commerce.

wrote a check to Firm A in the amount of $15,000.  That same day, a check in the amount of $15,000 was drawn from a Firm A account and made payable to AMENT, who then deposited the $15,000 check directly into the personal checking account he holds jointly with Person A (same account as discussed in Transaction #1 above).  The funds appeared to be used on personal expenses ("Transaction #2").

60.  Based on my training and experience, including my knowledge of this investigation to date, I believe that the movement of funds as described in Transaction #1 and Transaction #2 was performed in a manner meant to intentionally conceal the true recipient of a portion of the funds, *i.e.*, AMENT. Otherwise, the Chamber could have sent a $16,000 check to TA Consulting on July 18, 2019, and a $15,000 check to AMENT on October 16, 2019.  Instead, AMENT and Political Consultant 1 appeared to use Firm A to conceal the payments to AMENT.

61.  According to interviews of CW1 and the Cannabis Client, the Cannabis Client would not have paid the Chamber the amount they did had they known that at least $31,000 of their funds were going directly into AMENT's pocket.[37]  Furthermore, based on AMENT's statement on September 18, 2019 (*i.e.*, "this

---

[37] I interviewed one of the three founders of the Cannabis Client on May 10, 2021.  While the founder was not familiar with all the specifics of the purpose of the payments to the Chamber, he noted that he relied on CW1's expertise, including CW1's suggestion that the Cannabis Client make the requested payments to the Chamber.  CW1 would not have advised the Cannabis Client make the requested payments to the Chamber had CW1 been told that AMENT and Political Consultant 1 intended to conduct Transactions #1 and #2. The founder involved with the Cannabis Client's finances has not been interviewed yet.

is, this is the dispensary guys…investing in the Chamber"),
which was meant to solicit funds from CHS1's company, I believe
AMENT was outwardly soliciting funds in his capacity as
President of the Chamber and representing that the money would
go towards the chamber, not for his personal financial benefit.

        3.   <u>AMENT and Political Consultant 1 Provided a False
and Misleading Breakdown of Expenditures Related
to the Cannabis Client's Funds to CW1</u>

62.  On August 17, 2020, CW1 provided the FBI with a
spreadsheet that CW1 and CW1's associate had recently received
from Political Consultant 1, which contained the accounting of
how their clients' funds had been spent ("the spreadsheet").
The spreadsheet was titled "Chamber Cannabis Policy Task Force
Ledger."  It is important to note that, Political Consultant 1,
not AMENT, provided a Chamber product.  As will be described
further below, evidence gathered later showed that Political
Consultant 1 was the one who created and produced the
spreadsheet, not AMENT.  This is further evidence that, even
though Political Consultant 1 was acting as a lobbyist for the
Cannabis Client, he intentionally concealed that fact in order
to avoid reporting requirements.  This is consistent with what
Political Consultant 1 and AMENT explained during the September
18, 2019 recording described above, and with CW1's statements
during his/her post arrest interview on October 28, 2019 when
CW1 made the following statement:

      CW1:      Firm A gets paid by the Chamber.  So the Chamber
                    may be a non-profit and it was an easy place for
                    us to put [the Cannabis Client's] money and we

didn't put it in [Firm A] because that would mean
that would trigger [Firm A] to have to apply to
work with the city that they're working
specifically.  So right now [Firm A] is just
working for the Chamber Task Force.

63.  CW1's statement during the post arrest interview
illustrated his/her understanding that the Cannabis Client's
money was sent to the Chamber as a means to obfuscate the
Cannabis Client's true relationship with Firm A.  CW1's
statement further illustrated his/her understanding that the
Cannabis Client was paying for a specific service, that is, work
performed in furtherance of the Chamber Cannabis Task Force.  A
short time later, during the same recorded post arrest interview
of CW1, CW1 and FBI SA Joseph Nieblas ("Nieblas") had the
following exchange:

Nieblas:  So basically [Firm A] comes up with whatever the
ordinance is going to be, I should say the
grading procedures are gonna be

CW1:      [UI]

Nieblas:  So [Firm A] writes this, they give to [Anaheim
City] staff is supposed to [OV]

CW1:      [Firm A] writes this, they give it to the Chamber
Task Force, the Chamber Task Force rubber stamps
it, says this is ok or not ok, right and then
[UI]

…

CW1:      The [Firm A] puts it together, the Task Force
          thinks they did it, they rubber-stamp it, then
          that goes to [the Anaheim] City Manager.

Nieblas:  Ok, so [the Anaheim City Manager] takes it and
          you're under the assumption that they're just
          going to rubber stamp it at the city staff
          because. . .

CW1:      That's what we've been told.

64.   A short time later during the same recorded post-
arrest interview of CW1, CW1 and I ("Adkins") had the following
exchange:

Adkins:   So what [CHS1][38] and [the Cannabis Client] are
          buying when they retain you for Anaheim is
          information that the city council is going to
          vote on is information that was written by--

CW1:      [Firm A] or whoever [UI].  What my clients are
          paying me for is for me to have [UI].  They get
          this information before anybody else.  What
          they're paying for is [Firm A] or some entity,
          they don't know who the fuck it is.  They are
          trusting me to write a merit system that is
          beneficial to them, will be 100% and they will

---

[38] According to CW1's statement during his/her post arrest
interview, CW1 and CW1's associate had intended on keeping a
large portion of the cash they were soliciting from CHS1 in
exchange for access to the Chamber Task Force, which amounts to
fraud committed against CHS1.  CW1 appeared to rationalize
his/her behavior by explaining that CHS1 stood to benefit from
the work CW1 and CW1's associate had already performed related
to Anaheim.

help fund any research efforts, canvassing or
whatever the fuck it is and they you know can be
with God.  They apply and see what happens.

65.  Based on the exchanges highlighted above, I believe
CW1 reasonably believed, based on past conversations CW1 had
with Political Consultant 1 and AMENT, that the Cannabis
Client's funds being paid to the Chamber were in exchange for a
specific service.  It is also important to note that the
associated "Purpose" indicated by Political Consultant 1, in the
spreadsheet's line items containing the money from the Cannabis
Client and CW1's associate's client, is that of "Donation."
However, money provided to the Chamber in furtherance of the
Task Force was money specifically solicited by AMENT and
Political Consultant 1 in exchange for the promise of a specific
service performed by Firm A, not merely a donation to a charity
or public institution to be used in whatever way the recipient
saw fit.  I believe that the use of the term "Donation" in the
spreadsheet is yet another way that Political Consultant 1 and
AMENT attempted to conceal the overall scheme.

66.  On August 2, 2020, Political Consultant 1 emailed CW1
and attached vendor invoices, purportedly as backup for the
figures on the spreadsheet provided by Political Consultant 1.
FBI SA Joseph Nieblas, and I, have subsequently reviewed the
spreadsheet, the vendor invoices, and bank records from the
Chamber in an effort to determine the accuracy of the
information provided by Political Consultant 1 to CW1 and CW1's
associate.  As a result, we have discovered significant

inconsistencies, including efforts to conceal the existence of Transaction #1 and Transaction #2.

67.  Specifically, according to the spreadsheet, the Chamber claimed to pay $60,000 of the Cannabis Client's (and CW1's associate's client's) funds to Firm A.  However, according to the Chamber's bank records, the Chamber made four separate and equal payments to Firm A, in the amount of $20,000 each, totaling $80,000.  Each payment contained a memo reading, "Research & consulting on cannabis."  Therefore, I believe that Political Consultant 1 underreported $20,000 to CW1 and CW1's associate related to how their clients' money had been spent by the Chamber.  I believe this $20,000 underreporting helped conceal one of the kickback payments to AMENT because one of the $20,000 payments (made on July 18, 2019) was part of Transaction #1, which concluded with a $16,000 check made payable to AMENT, by Firm A, on the same day (see "Transaction #1" described above).

68.  The FBI concluded that of the $310,000 that both the Cannabis Client and CW1's associate's client paid to the Chamber, $234,700 was paid to either Firm A directly or to entities in which Political Consultant 1 had an ownership interest.  When the FBI shared this fact with CW1 on or about August 19, 2020, CW1 became upset and stated that he/she was unaware that Political Consultant 1 had ownership interests in said companies.

69.  Ultimately, the FBI's review of the spreadsheet, the invoices, and the bank records found that there were significant

inconsistencies, including invoices not matching the
spreadsheet, bank records not matching the spreadsheet, and
invoices not matching the bank records.  In order to confirm
whether these inconsistencies were intentional, the FBI
instructed CW1 to meet with Political Consultant 1 to discuss
the spreadsheet and the invoices.

    70.  On September 3, 2020, CW1 and CW1's associate met with
Political Consultant 1 in the offices of the Chamber, and CW1
recorded the meeting at the FBI's direction.  At approximately
10:13 a.m., CW1 was provided with a recording device by the FBI
and departed to meet with Political Consultant 1 and CW1's
associate.  I have subsequently reviewed a copy of the
recording.  During the meeting, the following conversation
occurred:

      CW1:    First question that I have is, um, cause I got
               the invoices from you, so you pulled those
               together for us.

      PC1:    Right.

      CW1:    And, and, you put this spreadsheet together for
               us.

      PC1:    Yes.

      CW1:    Okay.  The reason I ask is they don't match.

      PC1:    What doesn't match?

    71.  Based on my knowledge of this investigation to date, I
know that CW1 attended this meeting with copies of the invoices
and the spreadsheet, which I have reviewed and which has been
previously discussed herein.  This exchange shows that Political

Consultant 1 was the one who created the spreadsheet because Political Consultant 1 replied "yes" when asked by CW1 if Political Consultant 1 "put this spreadsheet together for us." As the conversation progressed, CW1 and CW1's associate pointed out inconsistencies and suspicious billings they found when they reviewed the invoices and the spreadsheet.

72.   At times during this recorded meeting, both CW1 and CW1's associate appeared to condone how some of their clients' funds were spent.  Based on information provided to the FBI by CWI, I believe that this approval, at times, was feigned.  Prior to this recorded meeting, CW1 explained to the FBI that he/she was going to challenge Political Consultant 1 regarding the discrepancies found in the spreadsheet and the invoices; however, CW1 expressed concern about challenging Political Consultant 1 too aggressively because CW1 did not want to upset Political Consultant 1 for fear that Political Consultant 1 and AMENT would retaliate against the Cannabis Client.  I believe CW1's concern further illustrated the influence Political Consultant 1 and AMENT had on the City of Anaheim, which was wielded by Political Consultant 1 and AMENT to solicit funds from the Cannabis Client that were later used to fund Transactions #1 and #2.

73.   A short time later during the same recorded meeting, the following conversation occurred regarding costs incurred by another consultant ("Consultant 3"):

CW1 Asso: What the hell did this guy [Consultant 3] get paid for?

CW1:        Yeah, what did he get paid for, what did he do?

CW1 Asso: Or was that not you paying him?

CW1:        Policy consulting, when you have [CW1] bringing
            you the money for all this shit and here you're
            giving [Consultant 3], who sounds like a porn
            star.

            [OV] [Laughter]

CW1:        These invoices, I mean it's like my, my
            kindergartner can print these out on fucking his
            iPad.  It's so shady and fucked up.

74.  After CW1 and CW1's associate confronted Political
Consultant 1 about why the Chamber paid Consultant 3 as
described above, they continued the discussion and appeared to
try and determine what Consultant 3's role was in the Task
Force.  Their conversation regarding the payments to Consultant
3 continued:

CW1:        You [Political Consultant 1] said he [Consultant
            3] was going to be on the Task Force, not paid by
            the Task Force, be on the Task Force, and we were
            very clear that we don't know what his policy
            issues are, but our policy issues are X, Y, and
            Z.  We want this, we kept repeating our policy
            objectives at every meeting we had, right?

CW1 Asso: Right, well at least with you [Political
          Consultant 1].

            [OV]

CW1:        Every meeting we had you [Political Consultant 1]
            were in, Todd [AMENT] was in some of them, but
            you were in them.

PC1:        Right.

CW1:        So I remember you always [UI], we always told you
            we didn't want any two per districts.

PC1:        Right.

CW1:        All of that madness came out of this ridiculous
            task force that we funded, that paid these
            motherfuckers twenty six thousand dollars.

75.  Based on my training and experience, including
knowledge of this investigation to date, I believe that CW1 was
expressing his/her disagreement with how the Cannabis Client's
funds were spent, specifically as it related to Consultant 3,
who, unbeknownst to CW1 and CW1's associate, was being paid out
of the Cannabis Client's funds.  I believe this is another
example of Political Consultant 1 and AMENT representing one
thing (Consultant 3 would be part of the Task Force) in order to
entice payment by the Cannabis Client, then doing another
(paying Consultant 3 with Cannabis Client funds).  Shortly after
this exchange, CW1's associate attempted to calmly ease the
tension, explaining that he had attempted to go over the numbers
with his client:

CW1 Asso: We had to go through the invoices…

CW1:        And the spreadsheet.

CW1 Asso: …and talk about the finances.

```
CW1:        Like, [CW1] why are we [the Cannabis Client]
            paying [Consultant 3] for policy consulting…

CW1 Asso:   Right.

CW1:        …with our money when you [CW1] are the person
            [UI], the whole point is you guys [CW1 and CW1's
            associate] are doing this?

CW1 Asso:   To be fair, the cannabis, uh, task force was kind
            of, uh, just came out of the blue and we were
            kind of blindsided by it and--

PC1:        Yeah.

CW1 Asso:   You know, and again, you know, kind of the way
            this was set up like in theory is that you know,
            we were working towards getting an objective
            completed but at the same time we were also
            supposed to be monitoring, and getting, you know,
            updates on the process.  And we kind of got
            ambushed when we came in and met with you, and
            then [AMENT] walks in and is like, "don't worry
            the cannabis task force is a great thing" and you
            know, little did we know nothing was ever
            mentioned that, "hey don't worry, I paid all my
            buddies to be on this task force."

CW1:        And they are his buddies.

CW1 Asso:   Line their pockets, which is what it looks like
            in the books, and our clients look and go, "what
            the fuck."
```

76.   This exchange, once again, highlights CW1 and CW1's associate communicating to Political Consultant 1 that they, and their clients, felt they were duped into paying for access to the Task Force, when in reality it appeared that AMENT was using the funds to pay his close associates, including Consultant 3. CW1 questioned the apparent absurdity of why Task Force funds (comprised entirely of money from these two cannabis clients) was used to pay Consultant 3 for policy consulting, when the Cannabis Client hired CW1 to provide cannabis policy consulting in the first place.

77.   Later, during the same recorded meeting, CW1 challenged Political Consultant 1 on another line item expense found on the spreadsheet, which was the purported payment the Chamber made to the offices of an attorney ("Attorney 1") during which the following conversation occurred:

CW1:      You know what, it's fine, I get it, everyone lines their pockets.

PC1:      Right.

CW1:      But this is disgusting.  We told you when [Attorney 1's] name came up, he's our direct competition.  [Attorney 1] was going out there telling his clients all the things we were working on in here.

CW1 Asso: Right.

CW1:      That our clients are paying for, made us look like jackasses quite honestly, but we worked our way through that and then I get this and you guys

paid him ten thousand dollars, and I don't get
it.

…

CW1 Asso:    Basically what it comes down to is like as our
clients see it too, is that, you know, they may
have paid to -- like let's just say this thing
[the cannabis ordinance] would have hit, and
there's some, there's some impetus like um, you
know obviously [AMENT's] still telling his people
that, you know, it's gonna happen in November.

CW1:         Oh yeah.

PC1:         [AMENT's] telling which people?

CW1:         We haven't had a conversation with [Political
Consultant 1] about this--so we are aware that
Mr. Ament took everything we said in these rooms
to some buddies of his that are connected to him,
so we knew what was happening, they'd go on his
boat, talk about all the meetings we had, giving
them updates on what we were doing here, and we
know about all of it.  And he's telling those
folks still it'll [the cannabis ordinance] come
up in November blah blah blah.  So [AMENT] quite
honestly took our money, took the information to
his friends, bragged about it, talked about it,
did all of that sort of stuff.  The whole point
was it was gonna be in confidence.  We were -- we

were gonna work on this ourselves.  You bring in

consultants that are our competition.

78.  During this exchange, I believe that CW1 and CW1's associate expressed their dismay at the fact that their client's funds were being used to pay Attorney 1, who, per CW1 and CW1's associate, represented their client's competitors.  They accused Political Consultant 1 and AMENT of soliciting funds from the Cannabis Client in exchange for access to, and influence over, the Task Force, only to turn around and use those funds to pay the representative of the client's direct competitors. Political Consultant 1 did not provide any invoices to CW1 from Attorney 1.

79.  A short time later, during the same recorded meeting, the topic of the conversation focused on the confidentiality of the information the Cannabis Client was expecting in return for the payments.  During this part of the conversation, the following exchange occurred:

CW1 Asso: We were never under the impression that
everything was a secret, that wasn't why we came
here, you know it wasn't like, you know, but at
the same time we also were under the impression
that, you know, we were working on certain policy
in a certain direction and that we would all work
together to collaborate on that, and that we
would try and keep it, you know, amongst
ourselves if we were the ones funding that…

PC1:      Sure.

CW1 Asso: …so at least we had, you know, some intellectual
          property…

PC1:      Right, I agree.

CW1 Asso: …if you want to call it that.

80.  Here, CW1's associate explained his impression that
his client was paying, at least in part, in exchange for work
product produced by the Task Force having some level of
confidentiality, the likes of which would be accessible only to
those who paid to produce it.  Political Consultant 1 agreed.
Furthermore, this agreement between Political Consultant 1, CW1,
and CW1's associate appears to be in line with the agreement
Political Consultant 1 and AMENT were pitching to CHS1, CW1, and
CW1's associate during the September 18, 2019 meeting described
above where Political Consultant 1 and AMENT were attempting to
solicit $350,000 from CHS1 for access to the Task Force.

81.  Shortly after they addressed the issue of
confidentiality, the conversation doubled back to a discussion
about what, exactly, Consultant 3 was paid for.  During this
part of the conversation, the following exchange occurred:

CW1:      And our client says, "hey [CW1] what did
          [Consultant 3's company] do that they got twenty-
          six thousand dollars of my money?"  And they call
          it "my money" because it's their fucking money.

PC1:      Fair enough.

CW1:      "I mean especially if you [CW1] and [CW1's
          associate] are going in there to advise on the
          policy that we want to see."

> PC1:     Well, and you, and you were, I mean [Consultant
>          3's] role in my mind was effectively, the, um,
>          the scrivener, if you will, I mean taking the
>          policy direction that I got from you guys and--

82.  When once again questioned by CW1 what Consultant 3
was paid for, Political Consultant 1 explained, or attempted to
explain, that Consultant 3 was paid $26,000 to perform the role
of "scrivener," which, to my understanding, is merely a scribe.
Political Consultant 1 continued to explain Consultant 3's role
for which he was compensated.  Political Consultant 1 explained
that he instructed Consultant 3 to gather cannabis ordinances
from other areas in order to build a structure so that Political
Consultant 1 could incorporate the Cannabis Client's policy
desires into the structure.  When CW1's associate asked
Political Consultant 1 if Consultant 3 wrote the ordinance,
Political Consultant 1 replied that Consultant 3 "cut and
pasted" pieces of ordinances he had collected from other cities.
CW1 and CW1's associate questioned the need for Consultant 3 in
this capacity.  CW1 then asked Political Consultant 1 for "a
little bit of honesty" and asked Political Consultant 1 why he
and AMENT were "lining [Consultant 3's] pockets, what was the
favor that was owed to [Consultant 3]."  Political Consultant 1
denied doing any such thing, but was unable to provide an
adequate explanation to CW1 and CW1's associate as to why
Consultant 3 was paid such a large sum for what amounted to
"cutting and pasting."

83.   Based on my training and experience, including my knowledge of this investigation to date, and my review of this recording, I believe that Political Consultant 1 knew Consultant 3's compensation was not commensurate with the work Consultant 3 actually performed, and as such, Political Consultant 1 appeared to be having difficulty convincing CW1 and CW1's associate otherwise.   Political Consultant 1 gave the unpersuasive explanation that Consultant 3 was paid $26,000 (which in actuality, according to the Chamber's bank records, was $28,000, as noted above) for collecting ordinances from surrounding cities and cutting and pasting different aspects of those ordinances.

84.   A short time later during the same recorded meeting, CW1 and CW1's associate continued to question the various costs paid for by their clients.   At one point, CW1 specifically began to question all of the various management fees their clients' funds were used to pay for.   At this point in the conversation, CW1 made the following statement:

CW1:      How many people [UI] did it take, except for the Chamber, to manage this when we literally, with all due respect, brought this to you on a silver platter, "here's what we need, here's how we can do it, we'll pay off [Former Anaheim Elected Official]'s[39] debts, how do we help [Elected Official 1], what do we do?"

_____

[39] The former Anaheim elected official was an elected member of the Anaheim City Council when CW1 apparently made this statement to Political Consultant 1

85.   Based on my training and experience, including my
knowledge of this investigation to date, I believe that CW1 was
referring to a specific instance, prior to CW1's cooperation
with the FBI, where CW1 approached Political Consultant 1
seeking assistance in passing a pro-cannabis ordinance in the
City of Anaheim.  Furthermore, I believe that CW1 may have
admitted to offering bribes to elected members of the Anaheim
City Council when he/she described his/her offer to "pay
off…debts" of a then elected member of the Anaheim City Council,
and "help" Elected Official 1.  The FBI was unaware of CW1's
prior conduct in this manner until I reviewed a copy of this
recorded meeting.  Finally, I believe CW1's prior conduct
further helps highlight the influence AMENT and Political
Consultant 1 had on the functioning of the Anaheim government at
the time.

86.   After continued confrontation on the part of CW1 and
CW1's associate regarding the Task Force's expenditures and the
invoices, Political Consultant 1 said, "I'm not trying to, you
know, run from anything or not, but I mean, I feel like I have
been one hundred percent honest with you all entirely through
this, including on my [I believe Political Consultant 1 then
made reference to the spreadsheet and invoices he provided CW1
and CW1's associate]."  I believe Political Consultant 1's
statement to be misleading because up until this point in the
recorded meeting, Political Consultant 1 did not provide
adequate explanations to CW1 and CW1's associate when challenged
on the accuracy of the spreadsheet and the invoices, or on how

the funds were spent altogether.  Furthermore, and perhaps more importantly, Political Consultant 1 did not disclose, or even hint at, the existence of Transaction #1 and Transaction #2, where AMENT personally benefitted, and essentially authorized his personal payments to be paid by his employer (the Chamber) through the use of Firm A's bank account.

87.  CW1 and CW1's associate told Political Consultant 1 that they did not trust AMENT, but that their clients still wished to move forward with working with Political Consultant 1, and possibly AMENT, in securing a pro-cannabis ordinance in Anaheim.  CW1 and CW1's associate admitted that it was an odd position to be in -- not trusting how their money was spent, yet still willing to move forward with the same individuals that were responsible for spending the money.

88.  A short time later during the same recorded meeting, the following exchange occurred:

CW1 Asso: Well let's ask that question, who did make the decision on who to pay, I mean, like the money was in the [Chamber's] account who…

PC1:     The money was at the Chamber.

CW1 Asso: So basically [AMENT] made the decision?  I'm not trying to put you on the spot, I'm just asking.

PC1:     I'm going to let you answer your own question.

89.  Based on my training and experience, including my knowledge of this investigation to date, I believe that Political Consultant 1 did not directly answer CW1's associate's question as a means to provide some protection for AMENT and, at

the same time, to avoid implicating himself (Political
Consultant 1) in a fraud scheme.

90.   Towards the conclusion of the meeting, Political
Consultant 1 noted, "I don't think, you know, given the dynamics
of Anaheim that having the front, if you will, of a Chamber Task
Force, was a bad idea in concept, not speaking to execution of
course."  Notably, Political Consultant 1 admits that the Task
Force was a "front."  I believe this statement illustrates the
fact that the Task Force was merely a smokescreen meant to hide
the true players, namely, the Cannabis Client, CW1's associate's
client, and Firm A, who were behind crafting a favorable
cannabis ordinance in Anaheim.  As Political Consultant 1 and
AMENT described in their September 18, 2019 meeting with CW1,
CW1's associate, and CHS1, all funds paid in furtherance of
securing a cannabis ordinance in Anaheim had to be paid to the
Chamber, not to Firm A directly, so as to avoid triggering
reporting requirements on the part of Firm A.  I believe the
Task Force was a guise used to conceal Firm A's lobbying
activities and solicit funds from the Cannabis Client.

91.   The September 3, 2020 recorded meeting covered
different aspects of how the Cannabis Client's funds were spent,
including conversations regarding the discrepancies between the
spreadsheet and invoices provided by Political Consultant 1, the
questionable expenditures made to entities owned and controlled
by Political Consultant 1, and expenditures made to those in
direct competition with the Cannabis Client and CW1's
associate's client.  Notably absent was any mention by Political

Consultant 1 of AMENT's direct benefits via Transactions #1 and #2.

92.   In addition to misleading CW1 and CW1's associate as to how their client's funds were spent, and omitting material details related to Transactions #1 and #2, Political Consultant 1 and AMENT actively and knowingly advocated against their clients' best interests, for which they had been paid.

    4.   <u>AMENT and Political Consultant 1 Advocated Against the Interests of the Cannabis Client and CW1's Associate's Client Despite Payments from Them to Advocate on Their Behalf</u>

93.   In addition to having defrauded the Cannabis Client and CW1's associate's client as described above, I believe that AMENT and Political Consultant 1 also advocated against their best interests without their knowledge.

94.   On November 30, 2020, at approximately 4:15 p.m., monitoring agents intercepted an incoming call to Target Phone 1 from AMENT.  During the phone call, AMENT, using Target Phone 2, and Political Consultant 1, using Target Phone 1, discussed multiple topics, to include the topic of cannabis in Anaheim. During that part of the phone call, they had the following conversation:

AMENT:    Yeah, umm, I have, I think, I got through to [Elected Official 1] that this is not an overnight thing.  We all agree it's a first quarter thing for next year.

PC1:    Right.

95.  Based on my training and experience, including my
knowledge of this investigation to date, I believe that this
brief exchange between Political Consultant 1 and AMENT
regarding cannabis began to illustrate their attempts to
advocate for cannabis in a way that appears to be against the
interests of CW1, the Cannabis Client, and CW1's associate's
client.  AMENT appeared to advocate for a position against the
interests of CW1, the Cannabis Client, and CW1's associate's
client when AMENT told Political Consultant 1 that, "I got
through to [Elected Official 1] that this is not an overnight
thing.  We all agree it's a first quarter thing for next year
[2021]."  Based on this statement from AMENT to Political
Consultant 1, and based on a subsequent intercepted phone call
(described in further detail below), I believe that Elected
Official 1 may have wanted to pass a cannabis ordinance as soon
as possible; passing the ordinance as soon as possible would
have been in the best interest of CW1, the Cannabis Client, and
CW1's associate's client, who had already paid AMENT and
Political Consultant 1 a substantial amount of money for this
very purpose over a year before this intercepted phone call.
Yet despite that, I believe that AMENT convinced Elected
Official 1[40] to postpone his plans for a cannabis ordinance in

_____

[40] Based on my training and experience, including knowledge
of this investigation at the time, I believe that AMENT was an
advisor to Elected Official 1, and had a level of influence over
him based on an intercepted call between Political Consultant 1
and AMENT captured on Target Phone 1.  During the phone call,
which occurred on November 25, 2020, Political Consultant 1 and
AMENT appeared to be discussing their recent summons to the
*(footnote cont'd on next page)*

Anaheim when he told Political Consultant 1 that he "got through to [Elected Official 1] that [cannabis] is not an overnight thing."

96.   On December 7, 2020, at approximately 7:30 a.m., CW1 placed an outgoing recorded call to Political Consultant 1 on Target Phone 1.  The call was simultaneously recorded by monitoring agents and CW1 at the direction of the FBI.  Also on the call was CW1's associate.  CW1 and CW1's associate contacted Political Consultant 1 to discuss the status of cannabis in Anaheim, particularly since Political Consultant 1 and AMENT had hosted the retreat for the "cabal" just a few days prior, where Political Consultant 1 had earlier informed CW1 that one of the topics of discussion would be cannabis.  During the phone call, they had the following conversation:

CW1:      [Elected Official 5 and Elected Official 1] spoke, and on two different occasions, two different occasions, [Elected Official 1 told Elected Official 5], "I want this wrapped up in January."

PC1:      Okay.

CW1:      [UI] everything correctly.

PC1:      Okay [CW1], I'm really struggling to hear you there's a lot of static.

---

Orange County Grand Jury for a matter believed to be unrelated to this investigation.  AMENT told Political Consultant 1 that he had received advice to answer the Grand Jury's questions, but not to elaborate.  Political Consultant 1 then told AMENT to explain to the Grand Jury that he (AMENT) was a personal friend and political and economic advisor to Elected Official 1.

     …

CW1:     [Elected Official 5] has told me on two different
occasions that [Elected Official 1] has reached
out, actually on multiple occasions, that
[Elected Official 1] reached out to him and told
him he wants this wrapped up by January.

PC1:     Right.

CW1:     Cause I told [Elected Official 5] I don't, not
that I don't care, I just want to know when it's
going to be so I have accurate information, you
know.

PC1:     Right.

97.  Based on my training and experience, including my knowledge of this investigation to date, I believe that CW1's explanation to Political Consultant 1 about CW1's conversations with Elected Official 5, further illustrated that Elected Official 1's initial inclination was to move fast on passing a cannabis ordinance in the City of Anaheim.  However, as the phone call progressed, it became clear not only that had Elected Official 1 changed his mind, but also that AMENT may have been the cause.  A short time later during the same intercepted and recorded phone call, the following conversation took place:

PC1:     By the time we got to the retreat, you know, if
[Elected Official 1] was talking about trying to
go in January, people had already talked him out
of that, um and, um,

CW1:        I'm sorry, when you say people have already
            talked him out of that, who are those, I know
            it's not you, I'm not blaming you, but who are
            these people who have talked him out of it?
            [OV]

CW1:        I'm just trying [UI] who are these people that
            talked him out of this?

PC1:        Uh, I don't know, I mean I would speculate that
            Todd [AMENT] probably would advise him that it
            would be better if he's not a part of it, um, and
            I can't argue with the advice…

98.   Based on my training and experience, including my
knowledge of this investigation to date, and based on Political
Consultant 1's earlier phone call with AMENT on November 30,
2020, I believe that AMENT actively lobbied Elected Official 1
to delay a cannabis ordinance against the best interest of CW1,
the Cannabis Client, and CW1's associate's client -- individuals
to whom he (AMENT) had been paid to advocate for to pass a
cannabis ordinance.  Furthermore, I believe that Political
Consultant 1 was complicit in covering up AMENT's conflict of
interest because when CW1 specifically asked Political
Consultant 1 who had talked Elected Official 1 out of passing an
ordinance in January, Political Consultant 1 lied and told CW1
he "would speculate" that AMENT had been the one to convince
Elected Official 1, when Political Consultant 1 knew for a fact
that it was AMENT based on their conversation on November 30,
2020.  I believe that Political Consultant 1 chose to lie to CW1

because, like AMENT, Political Consultant 1 likely knew that
admitting to such a fact would upset CW1, expose AMENT, and
provide further evidence that AMENT's and Political Consultant
1's cannabis scheme, as it related to CW1, the Cannabis Client,
and CW1's associate's client was, and continued to be,
fraudulent.

99.  A short time after this exchange, there was a long
silent pause on the part of CW1, to the point where Political
Consultant 1 and CW1's associate questioned whether CW1 was
still on the phone.  CW1 was still on the phone, but appeared to
be trying to compose him/herself before he/she made the
following statement:

CW1:      If Todd's [AMENT] advising [Elected Official 1]
          that clearly means to me that there's somebody
          else that's paying, our money has disappeared,
          right, he's already used our money to buy a boat,
          or do whatever else he wants to fucking do.  Our
          money is gone.  The money that my clients and
          [CW1's associate's] clients gave him has already
          been burned up so now he's got some new dumb
          cannabis [UI] he's trying to convince he can get
          something done for, and this is being delayed for
          them.  And everything we worked for, everything
          my clients paid for, whether it's paying for
          those asshole consultants you guys should never
          have hired, or all the other bullshit, it's been
          completely thrown out the window now.

100.  Based on my training and experience, including my knowledge of this investigation to date, I believe that CW1 did a relatively accurate job summarizing, in his/her own words, the fraudulent cannabis scheme perpetrated against CW1, the Cannabis Client, and CW1's associate's client by Political Consultant 1 and AMENT.  After CW1's statement, CW1's associate attempted to "play devil's advocate" by suggesting that perhaps AMENT was providing Elected Official 1 genuine political advice.  I believe that even if the advice was provided for Elected Official 1's political benefit, AMENT solicited and accepted funds (some of which I believe he would later embezzle via Transactions #1 and #2) to advocate on behalf of CW1, the Cannabis Client, and CW1's associate's client.  To then advise Elected Official 1 against their interests appeared inconsistent with a duty AMENT and Political Consultant 1 owed to those who paid them.

101.  In response to CW1's statement, Political Consultant 1 told CW1 that he was unaware of whether or not AMENT was representing any other cannabis clients.  I believe that this is another lie (or at a minimum misleading) because by this time, based on communications intercepted by monitoring agents, it was apparent that Political Consultant 1 and AMENT had, in fact, discussed a proposal from another potential cannabis client.

102.  Despite the significant evidence outlining fraud and embezzlement on the part of AMENT and Political Consultant 1 related to the cannabis scheme described herein, the FBI

nonetheless directed CW1 to give Political Consultant 1 one more chance to be truthful with regards to Transactions #1 and #2.

>    5.    <u>Political Consultant 1 Was Directly Asked by CW1
>          About Payments Made to AMENT from the Cannabis
>          Client's Funds</u>

103. On March 31, 2021 the FBI disclosed Transactions #1 and #2 to CW1 in an effort to prepare CW1 for a recorded phone call with Political Consultant 1.  CW1 became visibly upset and informed the agents that neither CW1, nor the Cannabis Client, had any knowledge of the payments to AMENT.  Furthermore, had they known AMENT was to be compensated from their funds, they would not have agreed to pay the amount of money they did.  At the direction of the FBI, on March 31, 2021, CW1 placed an outgoing phone call to Political Consultant 1 to discuss Political Consultant 1's relationship with one of CW1's competitors ("CW1's competitor")[41] and to ask Political Consultant 1 whether he paid AMENT using the Cannabis Client's funds.  The phone call was recorded by CW1, and was simultaneously intercepted by agents monitoring Target Phone 1.  During the phone call, the following conversation occurred:

CW1:       Is [CW1's competitor] on your payroll?  Is Todd [AMENT] on your payroll?  Has Todd ever been paid?

PC1:       Has Todd ever been paid?  What does that mean?

---

[41] CW1 described CW1's competitor as another cannabis consultant.

CW1:      From the work that my clients paid you guys for.
          Is he someone who's been paid?  Is, is, is [CW1's
          competitor] someone who you paid?

PC1:      I, I, [UI] [OV]

CW1:      [OV] Cause everyone's giving [UI] my business!

PC1:      [UI] I'm not paying [CW1's competitor] anything.
          Like said, they've asked me what it would cost to
          run ballot measures in a, in a, in a few cities
          and I've given them some numbers on it and I'm
          waiting to tell them if they want to do it [OV].

104. The above exchange is the first instance in which CW1
specifically asked Political Consultant 1 if he had paid AMENT
from the Cannabis Client's funds.  Political Consultant 1
appeared to deflect by answering the question with a question
when he replied, "Has Todd [AMENT] ever been paid?  What does
that mean?"  CW1 reiterated his/her question and again asked if
AMENT or CW1's competitor had been paid by Political Consultant
1.  Political Consultant 1 responded by answering CW1's question
as to his/her competitor, but ignored the question as to AMENT.
A short time later during the same recorded phone call, CW1
again pressed the issue of payment to AMENT with the following
exchange:

CW1:      What about Todd [AMENT]?  [UI]  Todd make any
          money off of my clients?  Did Todd make any money
          off of my clients that was in what I gave the
          chamber?

PC1:        Um, I--, I don't wanna, I don't wanna…get into
            that conversation, it's just, I [UI] I'd rather
            not revisit our, our painful past [OV] [UI].

105. Here, for a second time, CW1 asked Political
Consultant 1 if AMENT had "made any money off of my clients."
And for a second time Political Consultant 1 chose not to answer
CW1's question, and instead attempted to avoid answering the
question altogether by stating that he did not want to "get into
that conversation."  I believe Political Consultant 1 was
referring to their prior meeting that occurred on September 3,
2020, when CW1 and CW1's associate questioned Political
Consultant 1 about how their clients' funds had been spent, a
meeting during which Political Consultant 1 nonetheless avoided
discussing his payments to AMENT.  I further believe Political
Consultant 1 did so because he did not want to lie to CW1 and
tell him/her that AMENT was not paid from the Cannabis Client's
funds, when in fact he was, knowing if Political Consultant 1
told CW1 the truth, he/she would become upset and possibly alert
law enforcement.  A short time later during the same recorded
phone call, CW1 again pressed the issue of payment to AMENT with
the following exchange:

CW1:        Well the only way to get past the painful past is
            to make sure it doesn't happen again.  That's why
            when I heard these rumors, PTSD for [CW1].  Here
            it is again.  [Political Consultant 1] working
            with [CW1's competitor] behind my back.  And now
            I don't know.  Like it, it was my money.  It was

[the Cannabis Client's] money.  I, I have a right
to know who got it.  Cause I'll tell you, not
only did I get dropped and I didn't get, [UI] did
not get dropped, I'm still fucking working with
them, but I lost a shit ton of money on that
project.  At least a hundred and fifty thousand
dollars.  That's a lot of money in my life.

PC1:      Yeah.

CW1:      [UI] it may not mean much to [UI] the Big Bear
owning, yacht owning, river house owning person
like Todd [AMENT], [UI] and you gorgeous life, I
love seeing you with your beautiful family, but
that was a lot of money for me.  So there's two-
hundred and twenty fucking thousand dollars of my
client's [UI] not even including [CW1's
associate's client's] money.  I want to know, did
Todd [AMENT] get any of it?

PC1:      Uh, th--, well, [stuttering] [UI] call Todd
[AMENT] cause I just, I don't, I d--, I don't
want to get into that, I'm focused on [OV]

106. Here, for a third time, CW1 directly asked Political
Consultant 1 if he paid AMENT out of the Cannabis Client's
funds, or CW1's associate's client's funds.  And for a third
time, Political Consultant 1 refused to answer the question,
this time telling CW1 that he/she should call AMENT, presumably
to ask him if he was paid.  I believe Political Consultant 1 did
this knowing that he and AMENT had directed the funds to be

originally deposited into the Chamber bank account, but also knowing that CW1 would have no knowledge of the fact that the funds that ended up in AMENT's pocket, from the Chamber, were first routed through Firm A's bank account (as outlined in Transactions #1 and #2).  By responding in the manner he did, I believe Political Consultant 1 was attempting to deflect CW1's question and make it appear that AMENT would have acted alone in orchestrating any payments to himself, without the assistance of Political Consultant 1 and Firm A, which, based on Transactions #1 and #2, is not true.  A short time later during the same recorded phone call, CW1 again pressed the issue of payment to AMENT with the following exchange:

> CW1:     It wasn't on any of your invoices.  Cause when I, I was going over the invoices with my clients again [UI] that's why I needed an update, cause they kinda brought this back up.  I was going over all the invoices, and I [UI] seeing who's getting paid, that's why I'm all worked up over [Consultant 3] and and [Attorney 1] and those cock suckers, um, and I'm like [UI] I didn't see Todd [AMENT's] name anywhere.  So now I'm asking, has he fuckin ever gotten paid?

> PC1:     Well, I mean, I told you at the time that I shared some of what I got paid with Todd [AMENT], so, you know, let's just leave it at that then.

> CW1:     No you didn't.

> PC1:     Yes I did.

76

CW1:        No!  I assume the way you were having us run the
            money through the Chamber was cause Todd [AMENT]
            was getting paid through the Chamber.

107. Here, after the fourth and final time CW1 asked
Political Consultant 1 if he had ever paid AMENT from the
Cannabis Client's funds, Political Consultant 1 finally
provides, what appears at first blush to be, an admission that
he not only paid AMENT, but also told CW1 about it, a fact CW1
immediately refuted.  However, it is critical to note that
Political Consultant 1 stated that he "told [CW1] at the time
that [he] shared some of what [he] got paid with [AMENT]" in
response to CW1's question regarding his/her review of the
invoices.  Therefore, I believe Political Consultant 1's
statement of "at the time" was a direct reference to his
September 3, 2020 recorded meeting with CW1 and CW1's associate
where they discussed the invoices and expenditures of their
clients' funds (described above).  I have reviewed that
recording in its entirety and did not hear Political Consultant
1, at any point, disclose the fact that he paid AMENT.  Perhaps
more important is Political Consultant 1's use of the word
"shared" in the past tense in the context of his response, when
he stated, "I told you at the time that I *shared* [italics added]
some of what I got paid with Todd [AMENT]."  Political
Consultant 1 thus implies that it was not until after he paid
AMENT that he told CW1 about the payments (which, as described
above, I believe to be a lie).  In other words, payments
directly to AMENT personally were not agreed upon at the time

AMENT and Political Consultant 1 solicited the funds from the Cannabis Client and CW1's associate's client in the first place. Rather, I believe AMENT and Political Consultant 1 intentionally omitted this material fact in order to induce larger payments from the cannabis clients.

108. CW1 clearly, and concisely, asked Political Consultant 1 four separate times whether Political Consultant 1 paid AMENT with any of the Cannabis Client's funds.  It was not until CW1 asked a fourth and final time that Political Consultant 1 finally admitted to paying AMENT.  As described above, I believe the admission to be a lie; furthermore, I believe Political Consultant 1's statement to be a false exculpatory statement based on the following reasons:

a.   Political Consultant 1 did not specifically disclose such a payment on the spreadsheet he provided to CW1 and CW1's associate; instead, he appeared to hide the payment in a lump sum total paid to Firm A.  Although this line item on the spreadsheet indicated, "Note: A portion of this was shared with other public affairs consultants," I believe this to be misleading at best.  If Political Consultant 1 had disclosed Transactions #1 and #2 on the spreadsheet, it is likely that such a revelation would have angered CW1 and CW1's associate -- a response that Political Consultant 1 likely would have anticipated;

b.   Political Consultant 1 was given ample opportunity to disclose his payments to AMENT during the recorded meeting that took place on September 3, 2020, between

Political Consultant 1, CW1, and CW1's associate, the purpose of
which was to discuss the spreadsheet and the invoices;

        c.   Political Consultant 1 repeatedly avoided
answering CW1's questions on three separate occasions during the
March 31, 2021 recorded phone call; and

        d.   Political Consultant 1's statements to CW1's
competitor in a phone call he placed immediately after his March
31, 2021 call with CW1 where he admitted that CW1 only asks
questions he/she already knows the answer to (described in
further detail below).

    109. Approximately four minutes after the call with CW1
concluded, Political Consultant 1 sent an outgoing SMS/text
message to CW1's competitor and asked to talk.  Over an hour
later, Political Consultant 1 received an incoming phone call
from CW1's competitor over Target Phone 1 where they discussed
Political Consultant 1's recent "contentious" phone call with
CW1.  During the intercepted phone call the following exchange
between Political Consultant 1 and CW1's competitor ("CW1C")
occurred:

PC1:      [CW1's] like, are you talking with [CW1's
           competitor]?  And I'm like, [he/she's] not asking
           me that if [he/she] doesn't already know the
           answer to the question.

CW1C:     Yeah.

PC 1:     So I said, yes, I've heard from [CW1's
           competitor], they've reached out to us because
           they said they have some cannabis clients that

are looking at ballot measures and as you know we
run ballot measure campaigns.  They reached out
to us and said would you be interested in running
ballot measures for them if they decide to go
down that route.  And [he/she] said, well that
makes sense cause if I wanted to do a ballot
measure I'd hire you too [Political Consultant
1], and I said great, and I said so let me know
if you got any clients that want to do ballot
measures, but I've talked with [CW1's
competitors] about some ballot measures in some
cities.  [He/she] goes, is Anaheim one of them, I
said no, we're not really talking about a ballot
measure in Anaheim right now...

110. First, I believe that Political Consultant 1's
statement to CW1's competitor that "[CW1's] not asking me [if
I'm talking to you] if [he/she] doesn't already know the answer
to the question" explains why, after questioned by CW1 four
separate times about payments to AMENT, Political Consultant 1
finally gave a partial admission -- Political Consultant 1 had
come to the conclusion, after being asked four times, that CW1
was not asking him the question if CW1 did not already know the
answer.

111. Second, Political Consultant 1 provided yet another
example of how he was being untruthful to CW1, engaging in a
direct conflict of interest with CW1's competitors, and actively
negotiating with CW1's competitors against the best interests of

CW1, the Cannabis Client, and CW1's associate's client. Political Consultant 1 told CW1 during their phone call that he had entered into discussions with CW1's competitors to do cannabis-related ballot measures in other cities, but not in Anaheim.  However, during Political Consultant 1's phone call with CW1's competitor, they specifically discussed strategy surrounding a cannabis-related ballot measure in Anaheim, and how CW1's competitor could assist in financing such a measure.

112. Based on the explanation above, I believe that AMENT and Political Consultant 1 solicited funds from CW1 and CW1's associate, which directly caused their respective clients, relying on CW1 and CW1's representation of their respective companies, to pay money to the Chamber with the hopes of securing a favorable cannabis ordinance in Anaheim.  However, the funds appeared to be frivolously spent, including by paying individuals in direct competition with CW1 and CW1's associate. Furthermore, Political Consultant 1 and AMENT engaged in outright misrepresentations, material omissions, and breaches of duty by embezzling a portion of the Cannabis Client's funds out of the Chamber, through Firm A's account, and directly back into accounts held by AMENT personally.  Finally, when pressed multiple times, on at least two separate occasions, Political Consultant 1 went to great lengths to avoid answering the very simple question, *i.e.*, whether AMENT personally received a portion of the Cannabis Client's funds.

**C.    Political Consultant 1 and AMENT Initiated a Scheme to Purchase a Second Home for AMENT Through the Commission of the Target Offense.**

113. The investigation has also uncovered a scheme whereby AMENT engaged in a series of fraudulent acts that directly caused a financial institution to fund a mortgage, which AMENT used to finance the purchase of a 5,500 square foot home in Big Bear, CA.  The transaction was a combination of fraudulent acts, including (1) Political Consultant 1 inducing one of his employees to send approximately $205,000 to AMENT under false or fraudulent pretenses, (2) AMENT falsely representing to the bank that the $205,000 from Political Consultant 1 was income, and (3) an unlawful out-of-escrow payment made to the sellers, all of which are described further below.

                1.    <u>Political Consultant 1 Induced His Employee to Transfer $205,000 to AMENT Under False and/or Fraudulent Pretenses.</u>

114. Based on intercepted calls over Target Phone 1, I do not believe that AMENT possessed the requisite amount of capital required to secure the financing he needed in order to purchase a home in Big Bear, CA.  As a result, Political Consultant 1 and AMENT began to execute a series of financial transactions meant to deposit $205,000 into accounts controlled by AMENT and Person A.  I believe AMENT then lied to their financial institution about having enough cash reserves in order to secure financing for their Big Bear home purchase, a portion of which they used for the down payment, and another portion of which was used to perform an unlawful out-of-escrow payment made to the sellers without the lending institution's knowledge (described in

further detail below).  Also as described below, Political
Consultant 1 told his employee that Firm A owed rent to the
Chamber, when in actuality AMENT needed that money for
additional capital to close on the Big Bear house.  So, the plan
was to have Firm A give the amount Firm A allegedly owed the
Chamber in rent (approximately $200,000) to AMENT, AMENT would
close on the Big Bear house, and then AMENT would repay the loan
to Firm A, at which point Firm A could pay rent to the Chamber.[42]
As described below, AMENT fraudulently presented the $205,000 as
earned income to the financial institution in order to qualify
for the loan and purchase the Big Bear house.  Furthermore, I
believe AMENT did so with the assistance, and knowledge of,
Political Consultant 1.

115. On November 13, 2020, at approximately 9:34 a.m.,
monitoring agents intercepted an outgoing call from Target Phone
1 between Political Consultant 1 and Firm A Employee 1 ("FE1").
During their phone call, they had the following conversation:

PC1:      Thanks for sending out the wire, you'll see an
          email from me to [Chamber Employee 2] at the
          Chamber on them paying all of the stuff that they
          owe us.

---

[42] AMENT would later explain that Political Consultant 1
refused to pay the Chamber rent due to AMENT's failure to repay
the $200,000 loan.  This caused a rift between AMENT and
Political Consultant 1 because AMENT explained that the $200,000
loan he received from Political Consultant 1 was a matter of
personal business, and was in no way tied to Political
Consultant 1's rent owed to the Chamber.  AMENT stated his
intention to repay the loan to Political Consultant 1 upon the
sale of his (AMENT's) home located in Orange County, CA.

FE1:      Mhmm, I saw that.

PC1:      The deal is, I didn't want to put this in
          writing, but um, so they're going to pay us two
          hundred and something thousand dollars right,
          whatever that amount is.

FE1:      Right.

PC 1:     And um when Todd [AMENT] repays that loan after
          his house closes that's when we can pay the
          chamber all the back rent, so that's.

FE1:      Got it.

PC1:      So that's basically the transaction, they owe us
          two hundred thousand dollars, we owe them two
          hundred thousand dollars in rent and Todd [AMENT]
          needed two hundred thousand dollars in reserves
          in his bank account to close his escrow so he's
          basically paying us all now, we're going to loan
          that money back to him so it sits in his bank
          account for a couple of weeks and then he closes
          on his new house and then he'll give us that
          money back and then we pay the chamber the rent,
          so you get the math, right.

FE1:      Yep.

PC1:      So--[Chamber Employee 2] will work with you or
          [Firm A Employee 4] to send all that money by E-

> check today, we can deposit it, then when Todd
> [AMENT] pays us back the loan, then we'll pay the
> chamber the rent.

FE1:    Ok.

116. Based on my training and experience, including my knowledge of this investigation to date and the clarity of the explanation from Political Consultant 1 to his employee during the phone call, I believe that the Chamber may have owed Firm A approximately $200,000.  Once Firm A received the $200,000 from the Chamber, Political Consultant 1 would loan $200,000 to AMENT so that AMENT could secure financing for the Big Bear home purchase.  After AMENT secured the financing, and closed escrow on his new home, AMENT would repay the $200,000 loan back to Firm A, which would then use it to pay Firm A's rent to the Chamber in the amount of $200,000.  I believe that Political Consultant 1 and AMENT intended to conceal the nature of this transaction, as Political Consultant 1 said explicitly, "I didn't want to put this in writing" prior to laying out the scheme.

117. The same day, at approximately 10:45 a.m., monitoring agents captured an outgoing call from Political Consultant 1, using Target Phone 1, to AMENT, using Target Phone 2.  During the call, the following conversation occurred:

PC1:    Hey on the wire, phone authorization on a wire,
        we have a seventy-five thousand dollar per day
        limit, I'm trying to get, the problem is the

bank's in Sacramento so I have to have somebody
else sign onto the account which is my two old
original partners go in and sign the hand
authorization one which is -- one is they'll say
why are you wiring Todd two hundred and five
thousand dollars so which he'll do if I tell him
to do it, I'll tell him to shut the fuck up and
sign it.

AMENT:      Can we do three different -- go ahead.

PC1:        One thing I could easily do is do seventy-five
            [thousand dollars] today and seventy-five
            [thousand dollars] on Monday and fifty-five
            [thousand dollars] on Tuesday but if you need it
            all today and I'm either gonna just have to tell
            [Firm A Employee 2] or [Firm A Employee 3] go to
            the bank and sign it and don't ask questions.

AMENT:      Do three different wires though?

PC1:        Can do three wires to three different accounts.

AMENT:      OK, I'll send you two other accounts.

PC1:        Ok, cool.  Thanks.

118. Based on my training and experience, including my
knowledge of this investigation to date, I believe that this
call outlined the financial logistics of the scheme to provide a
loan in the amount of $205,000 to AMENT so that AMENT could

secure financing on the purchase of his new house.  I believe
that Political Consultant 1 was aware that his actions were
unlawful because Political Consultant 1 told AMENT that the bank
is located in Sacramento and therefore he (Political Consultant
1) would have to elicit the help of a former partner of his,
insofar as, if his former partner inquired as to why they were
wiring $205,000 to AMENT, Political Consultant 1 would tell his
former partner to "shut the fuck up and sign [the wire
authorization]."  Furthermore, Political Consultant 1 suggested
to AMENT that if AMENT needed the funds sooner, then he
(Political Consultant 1) would "tell [Firm A Employee 2] or
[Firm A Employee 3] go to the bank and sign it and don't ask
questions."

119. Approximately 14 minutes later, at 10:59 a.m.,
Political Consultant 1, using Target Phone 1, received an
incoming SMS/text message from AMENT, using Target Phone 2, that
read, "Emailed yo [sic] the other tow [sic] accounts info...all
3 at BOFA."  Political Consultant 1 immediately replied via
SMS/text message from Target Phone 1 writing, "Got em."  Based
on this exchange, I believe that AMENT emailed Political
Consultant 1 the account information for three accounts that
were to receive the funds, and in reply, Political Consultant 1
acknowledged receipt of AMENT's email.

120. Monitoring agents intercepted a couple additional
calls on the same day, including one from Political Consultant
1's bank confirming that three separate wires were going be sent

to AMENT and be deposited into an account held jointly between AMENT and Person A, and another account titled TA Consulting.[43]

121. According to bank records I have reviewed with FBI FoA Katherine Ramirez, we were able to confirm that the following incoming wires from Firm A were deposited into accounts controlled by AMENT as follows:

      a.   On November 13, 2020, Firm A wired funds in the amount of $75,000 to TA Consulting;

      b.   On November 16, 2020, Firm A wired funds in the amount of $55,000 to AMENT's personal account; and

      c.   On November 17, 2020, Firm A wired funds in the amount of $75,000 to a bank account held jointly between AMENT and Person A.

122. Additionally, on November 17, 2020, at approximately 11:35 a.m., monitoring agents captured an incoming phone call to Political Consultant 1 on Target Phone 1. The individual self-identified as Justin from First Northern Bank. Justin wanted to confirm that Political Consultant 1's signature on a $95,000 check (separate from the above wired funds) made payable to AMENT was, in fact, Political Consultant 1's because, as Justin stated, the "signature looks a little off." Political Consultant 1 told Justin that he (Political Consultant 1) "signed that check." I have reviewed the check in question, and the signature appears slightly different from signatures on other checks purportedly signed by Political Consultant 1, although I am not trained in handwriting analysis. Nonetheless,

---

[43] TA Consulting is an entity controlled by AMENT.

the fact that this $95,000 check was written on November 12,
2020 (one day before the influx of the three transactions
outlined above), then cashed by AMENT the following day on
November 13, 2020 into an account AMENT held jointly with Person
A, rather than AMENT's TA Consulting business account, all when
AMENT was having difficulty closing on the Big Bear house, calls
into question what AMENT did for Political Consultant 1 to earn
the funds.  When questioned about this check, AMENT at first did
not recall the purpose for it, but then advised that it was part
of the $200,000 loan described above.  By including this check
with the three wires received by AMENT in the following days
(described above) the total funds AMENT received from Political
Consultant 1 from November 12-17, 2020, totaled $300,000.  It is
currently unclear whether the additional funds received by AMENT
from Political Consultant 1 was legitimate, or a continuation of
the mortgage fraud scheme.

123. AMENT and Political Consultant 1 exchanged several
communications regarding the status of AMENT's Big Bear home
purchase up to the final day of initial interception over Target
Phone 1.  The content of the communications suggested that AMENT
was having difficulty securing financing for the home.  Based on
those communications, and other information, the FBI was able to
identify JP Morgan Chase ("Chase") as the bank that provided the
loan financing and the mortgage company that assisted AMENT in
securing the loan financing.  As a result, the FBI was able to
obtain AMENT's loan application and additional documentation
related to AMENT's Big Bear home mortgage.  I have reviewed the

documentation and have found multiple material misrepresentations AMENT made to Chase, which resulted in Chase funding the loan when, based on my training and experience, the institution otherwise would not have done so.  Based on open source internet searches I conducted, I know that Chase was insured by the Federal Deposit Insurance Corporation in November and December 2020.[44]

     2.  <u>Material Misrepresentations, Falsehoods, and Omissions Contained in AMENT's Loan Package to Chase</u>

124. Based on a report I obtained from a California real estate database, bank records, the loan file FoA Ramirez and I have reviewed as part of this transaction, and statements from AMENT, I was able to confirm that AMENT and Person A were successful in purchasing a five bedroom, seven bathroom, fifty-five hundred square foot home located in Big Bear City, CA on December 23, 2020 ("the Big Bear House"), for $1,450,000, $1,159,000 of which was financed.

125. As a result of this investigation, the FBI was able to obtain documentation in support of AMENT's purchase of the Big Bear House.  Contained in AMENT's loan file was a letter from Chase titled "NOTICE OF INCOMPLETENESS" which listed AMENT and Person A as the "Borrower(s)" as well as identifying the Big Bear House as the subject property ("the Chase letter").  The Chase letter, dated December 4, 2020, began as follows, "Thank

---

[44] According to https://banks.data.fdic.gov/bankfind-suite/bankfind/details/628?activeStatus=0%20OR%201&bankfindLevel ThreeView=History&branchOffices=false&name=JPMorgan%20Chase%20Ba nk&pageNumber=1&resultLimit=25, last visited on May 3, 2022.

you for the above residential mortgage application.  Based on
the information you submitted, we are not able to make a credit
decision.  In order for us to make a credit decision and to
continue processing this loan application, [p]lease submit this
letter and the information listed below, as soon as possible but
no later than 12/25/2020."  The Chase letter then listed
seventeen separate items that required AMENT's attention and
explanation for the loan to be approved.  FBI FoA Ramirez and I
have reviewed the Chase letter and AMENT's reply to the letter,
and compared the reply to other evidence obtained during this
investigation, including bank records for AMENT, Person A, and
AMENT's business.  Based on our review, we have found the
following misrepresentations, falsehoods, and omissions
contained in AMENT and Person A's mortgage application and
correspondence with Chase for the mortgage related to the Big
Bear House:

     a.   Item #2 in the Chase letter questioned the
discrepancy between the appraised value of $1,650,000 and the
final sale price of $1,450,000, a difference of $200,000.  In
response to item #2 in the letter, AMENT and Person A provided a
signed letter, dated December 4, 2020, that read, in pertinent
part:

> We negotiated the sales price of the
> property, but during the process, in
> assessing the costs, we determined that the
> price of $1,650,000 was more than we were
> comfortable affording.  However, the Seller
> was eager to sell, having had his home on
> the market for a long period of time (a few
> hundred days), and had made plans to buy in

> AZ, where he is currently in escrow.  Rather
> than lose the sale, and lose out on his
> purchase in AZ, he agreed to a price drop
> that convinced us to move forward.

Based on a review of AMENT's bank records, FBI FoA Ramirez and I
found that on December 24, 2020 (four days prior to the close of
escrow on the Big Bear House, which occurred on December 28,
2020), AMENT sent an outgoing wire in the amount of $200,000
from his TA Consulting bank account to a plumbing business.  I
have reviewed law enforcement databases, including
www.accurint.com, and found that the seller of the Big Bear
House is affiliated with what appears to be that plumbing
business.  Furthermore, based on the California Consumer Affairs
website www.cslb.ca.gov, last visited on May 20, 2021, the
seller has an active license listed in Big Bear City under the
name of the plumbing business.  Based on this information, I
believe AMENT and the sellers entered into an out-of-escrow
agreement in the amount of $200,000, the exact difference
between the appraisal price and the sale price communicated to
Chase.  Therefore, I believe AMENT and Person A's executed
letter in response to item #2 of the Chase letter was false, and
therefore fraudulent.  I further believe AMENT and the seller
entered into this agreement in an effort to accomplish the
following:  (1) assist AMENT in obtaining approval for the loan
by increasing his capital reserves, which, based on my training
and experience, I know to be a critical consideration for any
financial institution when funding a home loan; (2) lower
AMENT's tax base on the Big Bear House, resulting in lower

annual property taxes and thereby defrauding the people of San
Bernardino County where the Big Bear House is located;
(3) possibly lower the capital gains tax owed by the seller,
dependent upon the cost basis, and; (4) lowering the closing
costs to be paid by the seller (the real estate commission borne
by the seller is typically 5-6% of the selling price of the
property).

b.   I further believe that the out-of-escrow payment
from AMENT to the seller is a second down payment (the first
occurring through the typical escrow process) because the
$200,000 payment occurred prior to the close of escrow and,
generally speaking, a down payment is the amount of the purchase
price a buyer pays that is not financed in the mortgage loan.
Based on my review of AMENT's Uniform Residential Loan
Application, specifically Section VIII. Declarations, I found
that AMENT checked the "No" box to question h. that read, "Is
any part of the down payment borrowed?"  As described above,
four days prior to the close of escrow, on December 24, 2020,
AMENT made the $200,000 out-of-escrow payment to the seller.
However, based on a review of AMENT's bank records, we found
that the day prior (December 23, 2020) two deposits were made to
AMENT's TA Consulting account.  One deposit was a check made
payable to "Todd Ament" from the Chamber in the amount of
$35,000, which appeared to be written by AMENT himself.  The
second deposit was an incoming wire from the Chamber into TA
Consulting in the amount of $45,000.  Both deposits totaled

93

$80,000, the majority ($61,797.49[45]) of which went towards paying the $200,000 out-of-escrow payment to the seller the next day. Approximately one week later, on December 31, 2020, AMENT sent an $80,000 wire to the Chamber with a comment that read, "repay loan approved by [Chamber Official 1]."[46]  According to https://www.anaheimchamber.org/board-of-directors/, last visited on May 3, 2022, Chamber Official 1 is a member of the Board of Directors for the Chamber.  I do not know if Chamber Official 1 actually approved this $80,000 loan.  Nonetheless, I believe a significant portion of the $200,000 out-of-escrow down payment was borrowed by AMENT from the Chamber.  Therefore, I believe AMENT's assertion on his mortgage application that no part of the down payment was borrowed to be a false statement.

c.    Finally, items #5 and #6 in the Chase letter asked that AMENT provide the source of the three consecutive deposits arranged by Political Consultant 1 (described above) that were deposited into AMENT's various accounts.  In response, AMENT provided Chase with an invoice from TA Consulting to Firm A.  The invoice consisted of four separate line items, one of which was a lump sum payment of $75,000; the other three appeared to be for various consulting, election, and strategy work purportedly performed over the past ten months, but billed

---

[45] Based on FoA Ramirez's calculations using the Lowest Intermediary Balance accounting method.

[46] AMENT appeared to repay the loan from the proceeds of a $150,000 personal check from Political Consultant 1 to AMENT that occurred on the same day as the $80,000 Chamber loan repayment.  I do not know the nature of the $150,000 deposit from Political Consultant 1 to AMENT.

all at once via this invoice, which was dated November 1, 2020.
I believe the invoice to be fraudulent.  First, if these
payments from Firm A were made in exchange for legitimate work
performed by AMENT, then I believe Political Consultant 1 would
have simply provided Firm A Employee 1 with the TA Consulting
invoice as an actual vendor invoice requiring payment.  Instead,
and as was captured during the intercepted phone call between
Political Consultant 1 and Firm A Employee 1 on November 13,
2020 above, Political Consultant 1 told Firm A Employee 1 that
he "didn't want to put this in writing" and then proceeded to
explain that the $205,000 would be a loan to AMENT in order for
him to show enough reserves in his account for financing
approval before repaying the loan back to Firm A.  Second, and
once again, if the three payments from Firm A to AMENT were in
exchange for legitimate work performed and earned by AMENT, then
I believe Political Consultant 1 would have simply told AMENT
during their intercepted phone conversation on November 13, 2020
that he (Political Consultant 1) would provide Firm A Employees
2 and 3 with the invoice should they have any questions about
the payments.  Instead, Political Consultant 1 told AMENT during
this phone call that if his old partner asked any questions
about the payments, he would tell him "to shut the fuck up and
sign it," and further stated that if he needed to elicit the
help of Firm A Employee 2 or Firm A Employee 3 to make the
payments, he would tell them, "go to the bank and sign it and
don't ask questions."  Based on my training and experience, I do
not believe that Political Consultant 1's statements to both

95

Firm A Employee 1 and AMENT reflect what one would expect from a CEO conducting legitimate payments in response to a vendor invoice reflecting honest work.  Therefore, I believe the invoice provided by AMENT to Chase in response to items #5 and #6 were fraudulent.

126. For the reasons described above, I believe AMENT provided false and misleading statements, and omitted material facts, in response to items #2, #5, and #6 in the Chase letter. I believe AMENT's actions to be fraudulent, performed with the intent to induce Chase into funding the home loan for the Big Bear House.

3.   A Summary Timeline of AMENT's Purchase of the Big Bear House

127. To summarize the foregoing, the majority of which has been described in detail above, the following events occurred on, or about, the stated dates:

a.   September 29, 2020: AMENT and Person A submitted the first loan application for the Big Bear House, which depicted a sales price of $1,650,000.

b.   September 11, 2020: AMENT made a payment, in the amount of $33,000, to Orange Coast Title.[47]

c.   November 1, 2020: Date depicted on the invoice AMENT provided to the lending institution to explain the large dollar deposits into his bank accounts.

d.   November 13, 2020: Phone calls between Political Consultant 1 and Firm A Employee 1 and Political Consultant 1

---

[47] Orange Coast Title was the title company handling the Big Bear House transaction.

and AMENT where they discussed the movement of $205,000 between the Firm A account and AMENT's accounts.

e.    November 13, 2020: Firm A wired funds in the amount of $75,000 to TA Consulting.

f.    November 16, 2020: Firm A wired funds in the amount of $55,000 to AMENT's personal account.

g.    November 17, 2020: Firm A wired funds in the amount of $75,000 to a bank account held jointly between AMENT and Person A.

h.    December 4, 2020: Date depicted on the Notice of Incompleteness provided to AMENT by Chase Bank where Chase requested, among other things, that AMENT provide an explanation for the recent Firm A deposits (see above) and the discrepancy between the appraisal amount and the sales price.

i.    December 4, 2020: Date depicted on the letter AMENT provided to Chase Bank explaining the discrepancy between the appraisal amount and sales price.  The letter appeared to be signed by both AMENT and Person A.

j.    December 4, 2020: Date depicted on the letter AMENT provided to Chase Bank explaining the Firm A deposits. The letter also refers to the invoice as backup for the deposits (See subsection c above).

k.    December 4, 2020: AMENT made a payment, in the amount of $296,620.78, to Orange Coast Title.

l.    December 11, 2020: AMENT received a forwarded email from his mortgage banker.  The mortgage banker forwarded an email he wrote earlier to, who is believed to be, the real

estate agents involved in the transaction.  The email read, in part, "We just finished our last interaction of the day with Chase.  While it unfortunately took some back and forth (and thus a lot of time) clarifying the different documentation we provided to address Chase's questions, we were able to get everything reviewed and their underwriting is now satisfied with what we provided."

     m.   December 22, 2020: AMENT and Person A submitted the second loan application for the Big Bear House, which depicted a sales price of $1,450,000.

     n.   December 23, 2020: AMENT made a payment, in the amount of $27,319.55, to Orange Coast Title.

     o.   December 23, 2020: AMENT received a loan, in the amount of $35,000, from the Chamber.

     p.   December 23, 2020: AMENT received a loan, in the amount of $45,000, from the Chamber.

     q.   December 24, 2020: AMENT made the out-of-escrow payment, in the amount of $200,000, to the Sellers.

     r.   December 28, 2020: Escrow closed on the Big Bear House.

     s.   December 31, 2020: AMENT deposited a personal check from Political Consultant 1 in the amount of $150,000.

     t.   December 31, 2020: AMENT sent a wire to the Chamber in the amount of $80,000.  The purpose for the wire read, "repay loan approved by [Chamber Official 1]."

## VI. <u>Conclusion</u>

128. Based on the above, I believe that there is probable cause to believe that AMENT has committed the Target Offense.


                                        _____/s/_____
                                        BRIAN C. ADKINS, Special Agent
                                        FEDERAL BUREAU OF
                                        INVESTIGATION


Attested to by the applicant in
accordance with the requirements
of Federal Rule of Criminal
Procedure 4.1 by telephone on this
_16_ day of May 2022.


_____/s/ Autumn D. Spaeth_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE